*626
 
 SHINN, P. J.
 

 In a jury trial, Jay Robinson was convicted of four narcotics offenses consisting of the sale of amidone, the sale of heroin, and the possession of amidone and morphine. Probation was granted on condition that he serve one year in the county jail. Robinson appeals from the judgment and the denial of his motion for new trial.
 

 Defendant is a motion picture actor. The chief prosecution witness was Rodney Lynn, an aspiring actor who had known Robinson for two or three years and sought his help in obtaining theatrical roles. The following is the substance of Lynn’s testimony.
 

 On November 12, 1958, Lynn contacted Fred Kalas, a Los Angeles County Sheriff’s Deputy, and informed him that defendant was engaged in narcotics activities. He was disturbed because Robinson had told his theatrical agent and one of his friends that he was hooked on heroin, whereas he had taken heroin on only two occasions, once in San Francisco when he and defendant each took a heroin injection in the other’s presence, and again on November 6,1958, at defendant’s home on Stone Canyon Road, when he, Robinson and a man named Coster each took a heroin injection. On the afternoon of the 12th, on instructions by the deputies who had previously searched him and given him $15, Lynn, Kalas and Deputy Stamiesen went to the Bel Air Hotel parking lot where Lynn telephoned Robinson telling him he knew someone who was interested in buying some new “albums” but wanted first to try a sample; Robinson told him to come by in about 20 minutes. Lynn testified that the word “album” as used by them in prior conversations indicated a quantity of heroin. Lynn went to defendant’s home, gave him the $15 and received a blue bindle which was later proved to contain the narcotic amidone. Lynn told Robinson he would contact him later to make a larger purchase if the narcotic was satisfactory.
 

 That evening Lynn went to the Sheriff’s station and placed another telephone call to defendant, while Deputy Kalas listened on an extension telephone with Lynn’s permission. Lynn stated that his friend was pleased with the “first package” and wanted to buy $100 worth. In the first of two subsequent telephone conversations that evening, Robinson promised to have at least eight “papers” by noon the next day. After telephoning Robinson the following morning and arranging to pick up the "stuff ’ ’ in half an hour, Lynn went with Kalas, Stamiesen and several other sheriff’s deputies to the parking lot of the Bel Air Hotel where they separated, Lynn
 
 *627
 
 walking the distance to defendant’s house, the officers driving to the vicinity and stationing themselves around the premises. Lynn had previously been searched and handed $100 in ten dollar bills, the deputies keeping a list of the serial numbers. It had been settled that if Lynn made a purchase of narcotics he was to signal to the officers by turning and placing his hand against the front door as he left the house. Upon being admitted to the house, Lynn went into the bathroom with Robinson, handing him the $100 and receiving from defendant eight white bindles which were proved to contain heroin. They returned to the living room and talked to defendant’s guests, Dan Poster and Victoria Caldwell. Lynn placed the bindles in an empty cigarette package and put the package in his shirt pocket. As he left the house he signaled the officers whereupon they entered and placed the occupants under arrest.
 

 The evidence respecting occurrences in the Robinson home will be stated later in our discussion of the points on appeal.
 

 Testifying in Ms own behalf, defendant denied possessing narcotics, selling narcotics to Lynn, taking heroin in Lynn’s presence or telling anyone that Lynn was an addict. Lynn and Coster were at his home on November 6th but they discussed acting roles and the repayment of $115 or $120 Lynn had borrowed from him. Lynn telephoned him on November 12th asking to hear one of his phonograph albums; when Lynn came to the house Lynn gave him $15 in partial repayment of the loan. The telephone conversation on the evening of the 12th related to the playing of records Lynn wanted to hear and the $100 Lynn owed him; there was no mention of “packages” or “papers.” Lynn called him the following morning, stating that a check had cleared and that he had defendant’s money. Lynn gave him the $100 to pay the balance of the loan; another $165 found on his person at the time of his arrest represented an income tax refund. Defendant denied making any of the incriminating statements which were attributed to him by the arresting officers.
 

 A private investigator called by the defense testified that during five years as a detective on the sheriff’s narcotic squad he had never heard the word “album” used in reference to heroin. This testimony was in direct conflict with that of Stamiesen. The testimony of Coster, a witness of defendant, on cross-examination and of Deputy Kalas in rebuttal, will be related hereinafter.
 

 The contentions on appeal are the following: The court
 
 *628
 
 committed error in permitting the cross-examination of defendant with respect to alleged admissions to the arresting officers, which were denied by defendant, and in permitting rebuttal testimony by one of the officers with respect to such admissions which was properly a part of the People’s case in chief. A further contention is made that the court conducted the examination and cross-examination of witnesses in a manner that amounted to a usurpation of the duties of the prosecutor and which could not have failed to indicate a belief in defendant’s guilt. It is forcefully argued that these irregularities deprived defendant of a fair trial. We do not doubt that the procedure complained of was highly irregular ; the crucial question is whether defendant was thereby deprived of a fair trial.
 

 In their case in chief, the People elicited from Fred W. Halas, one of the arresting officers, the substance of conversations between defendant, Officer Stamiesen and himself at the time of his arrest. The witness testified that $100 in bills was taken from a pocket in defendant’s dressing gown together with the further sum of $165. Ten $10 bills bore the serial numbers of the bills that had previously been given to Lynn. Defendant said the money was his and that he had just received a check from the government. The witness did not testify on direct examination to any other conversation with or statement of defendant.
 

 Deputy Sheriff Stamiesen, one of the arresting officers, testified that at the time of the arrest in defendant’s home, on the basin ledge in the bathroom, he found a Serán wrap package or carton with Serán wrap around the outside and a part of a roll within, inside which was a plastic vial containing paraphernalia used in injecting narcotics; upon chemical analysis traces of morphine were found in two glass eyedroppers. In reply to questioning defendant said he knew nothing about the articles. He was asked later: “Now do you want to tell me who the stuff belongs to that was in the bathroom?” and defendant said “Yes, it belongs to me” and that the $100 in bills had been paid to him by Lynn for the eight bindles recovered from Lynn, and further that it was a part of a shipment he had received that morning along with the gum wrapper and that he admitted selling a bindle for $15 to Lynn the day before. In reply to questions by the court the witness testified that he found puncture wounds on defendant and Foster indicative of recent use of narcotics. This witness was not called in rebuttal.
 

 
 *629
 
 Under the guise of laying a foundation for impeachment by testimony of Officer Kalas, and directed by the court to lay a foundation by designating the time, place and persons present, defendant was cross-examined with respect to statements to the officers, not touched upon in their direct testimony. It will appear from the testimony of Kalas that these supposed statements were of a highly incriminating nature. Defendant denied having made any of the statements.
 

 Called in rebuttal, Officer Kalas testified that defendant stated in answer to leading questions, “Yes, I have been using narcotics for a couple of months. I got started in San Francisco and I came down here and had stopped using it, but it started up again about two weeks ago”; also “Yes, I received a shipment about 45 minutes or an hour ago before the arrest”; also the witness gave an affirmative answer to the question whether the defendant said that “If you would keep his arrest quiet from the papers, that he would cooperate with you”; also that the officers asked defendant what kind of cooperation he was referring to and defendant said “What if I gave you the name of my connection and several people who are involved in the Hollywood area?”; that the officers stated they were sure they could keep it away from the newspapers and if they divulged it it would tip off the connection and the other people defendant mentioned, that defendant could not make the call that day because the officers had to take him to the station and that defendant said that he would try to make the call the following day. On cross-examination the officer was shown the police report of the arrest; he admitted that it contained nothing with respect to any “deals or calling any connection, newspaper publicity, or anything of that nature.” When questioned by the court as to any reason for not mentioning the matter in the report, the witness answered that the officers did not want anyone outside of the department to know that defendant had agreed to work with the authorities.
 

 It is stated in the brief of defendant and conceded by the People that defense counsel had received from the prosecution a statement of the testimony that would be given by the officers and that there was in this statement no part of the substance of the testimony that was given by Officer Kalas on rebuttal. Neither was any of it contained in the copy of the police report that had been furnished defense counsel under order of court.
 

 During the foregoing cross-examination of defend
 
 *630
 
 ant, Ms counsel, anticipating that it was the purpose of the People to offer evidence that defendant had made the statements to the officers which he had just denied having made, interposed an objection to such evidence about to be offered in rebuttal upon the ground that any evidence of defendant’s incriminating statement was a part of the People’s case in chief and, therefore, not admissible on rebuttal. The objection was overruled. It should have been sustained.
 

 It was, of course, wholly unnecessary to question defendant on cross-examination with respect to any statement or admissions he may have made. The rules with respect to laying a foundation for impeachment by proof of inconsistent or contrary statements have no pertinency to proof of statements or admissions of a party. “The act, declaration, or omission of a party, as evidence against such party” may be proved upon a trial. (Code Civ. Proc., § 1870, subd. 2.) The statements attributed to defendant by the rebuttal testimony were a part of the People’s evidence in chief, and not proper rebuttal. The only proper method to have them placed in evidence would have been for the People to move for leave to reopen their case in chief. Defendant would have had a right to oppose the motion and it would have been necessary for the People to show good cause for granting the motion. Defendant could well have contended that he was taken by surprise. He had been furnished with a statement of the testimony the officers would give. It contained nothing except what was in the police report, which was also furnished him. There was no suggestion therein of the very damaging statements that were testified to on rebuttal. The court could well have denied a motion to reopen the People’s case.
 

 The device of bringing in the evidence as rebuttal upon the theory that it was proper by way of impeachment was merely a means of evading the proper and necessary step of seeking leave to reopen the case in chief.
 

 The People regarded the claimed statements of defendant to be a qualified confession. They elicited from Officer Kalas testimony that the statements were made freely and voluntarily. Of similar procedure we said in
 
 People
 
 v.
 
 Rodriguez,
 
 58 Cal.App.2d 415, at page 419 [136 P.2d 626]: “The procedure was entirely wrong. If the defendant had confessed, proof of the confession was a part of the case of the People and it was the duty of the district attorney to offer it before resting his case, when the testimony was then available and there was no reason for not offering it in chief. When
 
 *631
 
 the ease of the People is closed and the defense is in, the remainder of the People’s ease is limited to evidence in rebuttal of that produced by the defense and should be so limited by the court, except where a proper showing is made for reopening the ease in chief for the receipt of further evidence. The People have no right to withhold a material part of their evidence which could as well be used in their case in chief, for the sole purpose of using it in rebuttal. Evidence as to statements of the accused tending to show his guilt was admissible to establish the truth of the facts stated. Evidence offered to show contradictory statements of a witness or to otherwise impeach him is received because it bears upon the credibility of the witness and not for the purpose of proving the truth of the statements which are contradictory of the witness’ sworn testimony. The alleged confession was offered to establish facts constituting guilt; the impeachment feature was incidental and comparatively unimportant. It was no more proper for the district attorney to offer the evidence as rebuttal after defendant’s denial of the alleged statements, under the pretense that it was offered to impeach the defendant, than it would have been to offer it in rebuttal if the defendant had not been questioned about it at all. It makes no difference here that the testimony as to the confession, aside from being evidence of the fact of guilt, also tended to impeach the defendant.
 
 (People
 
 v.
 
 Yeaton
 
 (1888), 75 Cal. 415 [17 P. 544].)”
 

 We pass to the contention that the court, by constant and extensive interruptions and activity in the examination and cross-examination of the witnesses, assumed the role and function of the prosecutor and by so doing created in the minds of the jurors the impression that the court favored the case of the People. Although we are generally opposed to quoting our former opinions at any considerable length it seems appropriate that we incorporate our views on the subject as stated in
 
 People
 
 v.
 
 Campbell,
 
 162 Cal.App.2d 776, at pages 786-788 [329 P.2d 82] : “The interrogation of the witnesses by the deputy district attorney on direct and cross-examination was orderly and efficient. The questions propounded by the court were only those which would naturally have been asked by the prosecutor. Nothing had been overlooked or was likely to be overlooked by the prosecutor in the elicitation of all relevant testimony. There was no hesitation upon the part of any of the witnesses to testify freely and no uncertainty whatever in their testimony. There was
 
 *632
 
 no occasion whatever for the court to take over the duties of the deputy district attorney in the questioning of the witnesses, and yet this is what the court did persistently. There can be no doubt as to the duty of a judge to render assistance during the course of production of evidence in a jury trial, where assistance is needed. A witness may be evasive and his answers incomplete or uncertain, important matters may be overlooked by counsel, and in these and similar instances, it is entirely proper for the court to intervene in order to aid in the elicitation of clear and comprehensive testimony. This, of course, must be done in a manner that gives no indication of the court’s inclination for or against either party. But for the court in a criminal case to interrupt the orderly and efficient interrogation of the People’s witnesses by the prosecutor and to take over the latter’s duties repeatedly, as was done in the present case, can scarcely fail to have some influence upon the minds of the jurors adverse to the defendant. Judges have been admonished time and time again of their duty to maintain a strictly judicial attitude and to refrain from comment or other conduct which borders upon advocacy. We deem it appropriate to quote in part the remarks of the Supreme Court in
 
 People
 
 v.
 
 Mahoney,
 
 201 Cal. 618, 626-627 [258 P. 607] : ‘Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant. It is unnecessary to cite the cases bearing on this subject. It is a fundamental principle underlying our jurisprudence.’ When the trial judge officiously and unnecessarily usurps the duties of the prosecutor by taking over the questioning of witnesses and in so doing creates the impression that he is allying himself with the prosecution, harm to the defendant is inevitable. We do not see how any judge could fail to recognize that fact.
 
 (People
 
 v.
 
 Long,
 
 63 Cal.App.2d 679, 685 [147 P.2d 659].) Our question is not whether the court’s conduct was harmful to the defense; we are certain that it was. The difficult question in such situations is whether the invasion of the defendant’s rights was of so serious a nature as to have resulted in a conviction which otherwise, in all probability, would not have occurred. If we were in doubt here as to the correct answer we would resolve the doubt in favor of the accused.” We held that in view of the strong evidence of guilt the conduct of the court did not warrant a reversal of the judgment.
 

 
 *633
 
 We are convinced that in the present ease the court unnecessarily participated in the trial by the examination and cross-examination of the witnesses to an extent which deprived the defendant of a fair trial.
 

 As much as we dislike to lengthen our opinion by incorporating therein extensive excerpts from the reporter’s transcript it seems to be the only means by which it can be fairly and adequately shown how far the trial judge went in assuming the role and exercising the functions of prosecutor. That is the point we are discussing. It is not that the court asked improper questions. Upon the contrary, the questions generally were such as a prosecutor could properly have asked and very likely would have asked. To the extent that he was interrupted in the performance of his duties, to that extent they were assumed by the judge.
 
 [1]
 
 We have excluded from the excerpts other passages showing participation by the court such as would normally occur during a trial. With few exceptions the court’s participation was not for the purpose of clarifying the testimony of a witness or bringing out a fact that had been overlooked; there were needless interruptions and they were of a nature which tended to develop the case of the People.
 

 We refer to particular instances of the court’s participation. The word “album” was used by Lynn in telephonic conversations with defendant and in other connections. A most important question was whether the word had a secondary meaning. The court took upon itself to develop in the testimony of Lynn that by prearrangement with defendant “album” would mean heroin. The court developed the fact that Deputy Kalas was listening in on Lynn’s conversation with defendant, with the knowledge of Lynn, and the court then called for the conversation. The court corrected Lynn’s use of “bindles” to “papers.” The court aided Lynn in his efforts to remember a date. The court brought out the number of calls made by Lynn from the sheriff’s substation, that Kalas was on an extension and that all the calls were with Lynn's consent. The court took the initiative in bringing out what was said and done when Lynn first telephoned defendant and that Lynn and the officers then went to defendant’s residence on Stone Canyon Road. The court then reviewed and repeated the testimony of the witness with respect to the telephone conversations and the movements of the parties. The court developed in the testimony of Stamiesen that a signal
 
 *634
 
 was prearranged upon which the officers would enter defendant’s house and make an arrest. The court also developed that another signal was given by Officer Rodrigues indicating that he had observed Lynn’s signal. The court by extensive questioning brought out the extent of Kalas’ experience as a narcotics officer, had him explain as a qualified expert the purpose of the paraphernalia that was found by the officers and how such articles are used. The court brought out that there was a connection between the roll of adhesive tape and narcotic addiction in that the tape was used to bind together the bindles. The court brought out that the word “fix” is used as a verb or a noun to mean the use of a narcotic. The court brought out in the testimony of Officer Stamiesen that he examined defendant and found puncture marks and upon further questioning by the court developed that there were at least ten marks. The court asked “How many marks did you see, starting with number one to infinity—one, two, three, four—how many?” and received an affirmative answer to the question whether these marks might be evidence of addiction. The court inquired of Officer Kalas as to the reasons or excuses for the inadequacy of the police report. Time and again facts were developed by the court’s questions which were of the very essence of the People’s case. They were the prosecutor’s best ammunition. They were the most damaging to the defendant. Being elicited by the court they no doubt had a greater impact upon the minds of the jurors than they would have had if brought out by the prosecutor.
 

 Neal Tucker Coster, an aspiring actor, testified on behalf of defendant to the friendly relations between defendant and Lynn. He contradicted the testimony of Lynn that on one occasion when Lynn visited Robinson, that Lynn, Robinson and the witness injected themselves with a narcotic and he denied that any of them had done so. He testified that Lynn told Robinson that he had a cheek coming the following morning and would return the money he owed Robinson. The witness was ably and fully cross-examined by the deputy district attorney and after the latter announced that he had nothing further, the court took over and conducted further cross-examination. This interrogation covered with infinite detail the entire testimony of Coster given on direct. The court conducted a cross-examination which comprises 13 pages of the reporter’s transcript. The court asked 99 questions. There was nothing whatever to be clarified in the testimony of the witness and we cannot see that the cross-examination
 
 *635
 
 was intended to serve any purpose other than to strengthen the cross-examination by the deputy.
 

 While the deputy district attorney was conducting the cross-examination of defendant in a competent and thorough manner, the court, after having made numerous interruptions, took the cross-examination out of the hands of the deputy and proceeded to conduct a cross-examination at great length. We have read the entire cross-examination and have found in it no reason or justification for the court’s participating in it.
 

 The cross-examination of defendant and Coster by the court was meticulous and critical; it was such cross-examination as a vigilant and resourceful prosecutor would conduct for the purpose of detecting contradictions and inconsistencies in the testimony of a witness in an effort to discredit him. In each instance the cross-examination by the deputy district attorney had been properly and efficiently conducted. He did not need any assistance from the court. The fact that the court saw fit to assist in the cross-examination of the witnesses by the prosecutor by its own interrogation would normally mean, and would reasonably be understood to mean, that the court was skeptical whether the testimony given by the witnesses on direct would stand up under further severe and extensive cross-examination. We do not see that it had any other purpose.
 

 We have not encountered in any case of our own, nor have we discovered in our extensive reading of the decisions of our courts a record in a criminal case in which the judge undertook to try the ease for the People to the extent, or nearly to the extent as was done in the instant ease. The inevitable tendency of the court’s participation in the trial, always on behalf of the People, was to create in the minds of the jurors the impression that at least the court’s sympathies lay with the prosecution. The record as a whole demonstrates that the judge acted as prosecutor as obviously and efficiently as would have been the case had he been sitting beside the deputy district attorney at the counsel table. To be sure, there is nothing in the record in the way of an expression, direct or implied, of the court’s belief in the defendant’s guilt, but we are nevertheless convinced that the voluntary assistance rendered by the court in the presentation of the People’s case could not have failed to add weight to it in the minds of the jurors, to the great disadvantage of defendant. As the court stated in
 
 Hunter
 
 v.
 
 United States,
 
 62 F.2d 217: “It is too much to expect of human nature that a judge can actively and
 
 *636
 
 vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial.”
 

 Entertaining no doubt that the court’s rulings and actions were prejudicial to the defendant, our question is whether the prejudice was so great as to deprive the defendant of a fair trial. We believe it was.
 

 It is not contended by defendant that the evidence was insufficient to justify the verdict. Manifestly, it was sufficient; but, in our opinion, it was not so strong or conclusive as to have precluded a reasonable doubt in the minds of the jurors as to defendant’s guilt.
 

 The case was essentially one that required appraisal of the credibility of the witnesses. The witness Lynn was not only an informer, which in the minds of all right thinking persons would have caused his testimony to be regarded with suspicion and aversion, but he was an ingrate who had been befriended by defendant and had sought and received from defendant assistance in the development of his incipient career as an actor. Moreover, he was vengeful and bent upon the utter destruction of the reputation and career of Robinson. When he went to the authorities it was with the purpose of entrapping Robinson. He would not have been above shaping his telephonic conversations to fit his ends. There was not entire agreement among the witnesses as to the words used in the conversations other than the word “album.” Paraphernalia was found in the bathroom which furnished definite evidence that some one had been using narcotics. At the time the articles were found in the bathroom two guests were in defendant’s home, one of whom was evidently a user of narcotics, and according to Lynn, he, Robinson and Foster had been in the bathroom. According to defendant, Lynn was alone in the bathroom for some time. Lynn had been there the previous day. It is true that Officer Stamiesen testified that defendant admitted ownership of the paraphernalia but he also testified that defendant stated he knew nothing about it. Defendant, when questioned whether he had received $100 from Lynn, admitted that fact. According to Officer Stamiesen, defendant also admitted that he had received it in payment for the eight bindles. It was signifícánt that the police report contained nothing with respect to defendant’s admissions as testified to on rebuttal by Officer Kalas and contained nothing with respect to the scars on defendant’s arm as described by Officer Stamiesen, although the report made note of similar scars found on Foster. The testimony of Kalas in rebuttal consisted of the most material and damaging state
 
 *637
 
 ments of defendants, none of which was related in Kalas’ direct examination. It pictured defendant as a foul fellow who was willing to barter all honor and decency for the favor of being shielded from publicity. If the jurors had believed that defendant made the offer it is little wonder that they found him guilty. All the incriminating statements related by the state’s witnesses were denied by defendant. The jury had before it evidence that defendant was enjoying a highly successful career as an actor; he owned a residence worth $55,000 or $60,000 upon which there was an encumbrance of $17,000. While not immediately employed, he had prospects of lucrative employment. He had remained inactive to care for his invalid mother. It did not appear that there was any necessity for him to engage in the odious and detestible traffic in narcotics, nor did it appear that he had formerly furnished or sold any narcotics. Certainly it would have been an irrational thing for him to acquire narcotics merely for the purpose of passing them on to Lynn in return for $100.
 

 We do not imply that there was not substantial evidence of defendant’s guilt nor do we express a doubt as to his guilt. Even if guilty he was as much entitled to a fair trial as if he had been innocent. We do not believe he had a fair trial. When the court conducts the case of the prosecutor, as was done in this case, it constitutes in our opinion an irregularity which necessarily tends to balance the scales in favor of the People. Approval of the procedure disclosed by the record would establish a most unfortunate precedent. We consider it to be our duty to express our strong disapproval of the court’s undertaking to present the case of the People as was done in the present case.
 

 The People make the point that defendant registered no objection to the court’s extensive participation in the trial of the case and that he failed to cite it as misconduct. It is contended that this precludes him from now urging the court’s conduct as a ground for reversal of the judgment. We cannot agree with the People on this point. It is obvious to us that the court considered it to be a part of its duty to render aid in the development of the case of the People and that any protest uttered by defendant’s attorney would have been unavailing. It is not for lawyers to instruct judges as to their judicial duties. Defendant’s attorney would have had to be on his feet as much of the time as he would have been seated if he had attempted to do so. Throughout the trial, defense counsel was respectful toward the court and the
 
 *638
 
 witnesses. We do not believe it would have been in the interests of his client to interpose continuous objections or to otherwise express disapproval or criticism, of the court’s actions and thus run the risk of incurring the disfavor of the jurors, and perhaps of the court. We do not doubt that to utter a protest every time the defense was hurt by an answer to the court’s questions or to insist that the court desist from its procedure would have been a tactical mistake.
 
 (People
 
 v.
 
 Mahoney,
 
 201 Cal. 618 [258 P. 607].)
 

 We return to the first point previously mentioned, namely, the error in the admission of the rebuttal testimony. As we have stated, that testimony would have been properly received only if the court had granted a motion by the People to reopen their case. There was no such motion. There was no showing by the People which would have warranted reopening the People’s case, after the defense had rested. Defendant had no occasion to resist the motion because none was made. During the questioning of Kalas counsel renewed his previous objection that the rebuttal testimony was inadmissible, and it was again overruled. Had the court excluded the rebuttal testimony of Kalas it would have left out of the case evidence of the statements of defendant which, being before the jurors, could have been deemed by them the most discreditable of all. As we have said, it was error to overrule the objections of defendant.
 

 It should be understood that we are not considering a charge of misconduct as that term is commonly used. It is scarcely necessary to affirm our conviction that the court’s participation in the trial was with the best of motives and without realization that it might have the effect of influencing the minds of the jurors. It is known to all practicing attorneys that when one of their number has been placed upon the bench it requires considerable effort upon his part to develop the patience and impartiality which is an indispensable attribute of judicial conduct. The effort is no doubt more difficult for those who have had extensive training in advocacy, which no doubt was the situation in the present case. We conclude our discussion of this feature of the case by quoting from the opinion of the court in
 
 People
 
 v.
 
 Boggess,
 
 194 Cal. 212 at 241 [228 P. 448], as follows: “There can be no doubt that it is the duty of the trial court, if the exigencies of the occasion require it, to facilitate, by one or more proper interrogatories, the direct and cross-examination of a witness. But for the court to repeatedly take the defendant as a witness out of the hands of his counsel who, as
 
 *639
 
 the record before us shows, was apparently competent, conscientious, and expeditious in his conduct of the case, and proceed along an independent and extensive line of examination and cross-examination is not only not commendable but highly irregular and for the sake of due and orderly administration of justice should not be indulged in. Ordinarily the proper course, and the one generally pursued, is to allow the examination by counsel—direct, cross, redirect and recross —to conclude, and then if anything in the judgment of the trial court remains obscure, which may be material for the jury to know, and it seems desirable that an examination of the witness should be further pressed, then, with perfect propriety, the trial court may, and, indeed, should, intervene so that the ends of justice may be subserved. This, however, should be done with care, particularly where the witness is the defendant in the case, lest the jury should, because of the court’s intervention, and because of that fact alone, indulge in adverse inferences and conclusions from the testimony of the witness. In view of the situation of the evidence in the instant case, considered with reference to the erroneous rulings hereinbefore referred to, and the adverse impressions which the jury undoubtedly received from the court’s intervention in the examination of witnesses in the manner indicated, we are of the opinion that said rulings and intervention, taken together, contributed materially to the conclusion reached by the jury. Judgment is reversed. ’ ’
 

 In our opinion the error in the admission of the rebuttal testimony without giving defendant an opportunity to oppose the reopening of the People’s case and the participation of the court in developing the case of the People deprived the defendant of a fair trial and require the reversal of the judgment.
 

 The judgment and the order appealed from are reversed.
 

 Vallée, J., and Ford, J., concurred.
 

 Direct Examination of Lynn
 

 (The witness had testified that Robinson had stated that he, Lynn, was hooked on heroin.)
 

 “The Court: You say that the defendant told you, your friend that you were hooked on heroin?
 

 “The Witness: Yes, sir.
 

 “The Court: All right, go ahead. . . .
 

 “The Court: Who—who is he you are talking about? . . .
 

 “The Court: You were afraid your actor’s agent would repeat the information and . . .
 

 “The Court: All right, you were fearful of that.
 

 “The Witness: Yes, sir.
 

 
 *640
 
 “The Court: Go ahead, what other reason or reasons did you have for going to the police.
 

 “The Witness: That is about all. . . .
 

 “The Court: When did you discuss with Mr. Eobinson before November 12, the use of the word ‘albums’?
 

 “The Witness: Several times in the two prior months.
 

 “The Court: Were these on the telephone, these conversations?
 

 “The Witness: Tes, sir.
 

 “The Court: Always?
 

 “The Witness: No, sir.
 

 “The Court: I am not asking you when you talked to him on the telephone and you used the word ‘albums.’ The question is, did you ever have a conversation with Mr. Eobinson about the use of the term ‘ albums ’ ?
 

 “The Witness: Tes, sir.
 

 “The Court: Do you remember when that conversation took place?
 

 “The Witness: Prior to November 12?
 

 “The Court: Tes.
 

 “The Witness: Not exactly, no, sir.
 

 “The Court: Well, do you remember where the conversation was had?
 

 “The Witness: There were quite a few of them, sir. Some were at Mr. Eobinson’s house; some at my house and some on the phone.
 

 “The Court: Was this word ‘albums’ that you say you used in conversations with Mr. Eobinson, did that have some prearranged meaning between you and him?
 

 “The Witness: Tes, sir.
 

 ‘ ‘ The Court: When did you pre-arrange the meaning of the word, that is what I want to know. With respect to November 12, 1958, when did you converse with him relative to some ascribed meaning for the word ‘albums,’ if you did discuss it with him? . . .
 

 “The Court: What did the word ‘albums’ mean to you?
 

 “The Witness: A package of heroin.
 

 “The Court: So that there was no conversation between you and the defendant whereby you in substance and effect said to the defendant and he, the defendant, in substance and effect, said to you, ‘Whenever we talk about narcotics, we will substitute the term ‘albums’ therefor.
 

 “The Witness: No, sir.
 

 “The Court: All right. But whenever that word was used between you, at least, to you, that meant a packet of heroin, is that right?
 

 “The Witness: Tes, sir.
 

 “The Court: Go ahead. . . .
 

 “The Court: His name is Stamiesen.
 

 “The Witness: Officer Stamiesen.
 

 ‘ ‘ The Court: That is he at the table there, Officer Stamiesen. All right, go ahead.
 

 “The Witness: And asked me-
 

 “Mr. Eansom: I object at this point to the conversation.
 

 “The Court: Tes, don’t give the conversation. Tou met the officers. Give us your physical movements after you met them, without relating the conversation between you and them.
 

 “The Witness: I then again called Mr. Eobinson. . . .
 

 “The Court: It is overruled. Was the Sheriff—was somebody listening in on an extension, to your knowledge?
 

 “The Witness: Tes.
 

 “The Court: Who?
 

 “The Witness: Officer Fred Kala's.
 

 “The Court: What was the conversation you had with defendant Eobinson at that time? . . .
 

 “The Court: In which of these phone calls did he say that, number one, two or three?
 

 
 *641
 
 ‘1 The Witness: I think it was the second one, sir.
 

 ‘ ‘ The Court: Did he use the word bindle ?
 

 “The Witness: No, he said, ‘. . . eight papers . . .’
 

 ‘ ‘ The Court: When you are quoting him, you want to use the language he used as nearly as possible. He said ‘papers’ not ‘bindles’9 . . .
 

 “The Court: How many did that make in all—you and these two officers here, Halas and Stamiesen—how many of you were there altogether?
 

 “The Witness: There were six all told.
 

 “The Court: Including you?
 

 “The Witness: No, this was just police officers, sir.
 

 “Q. By Mr. Chandler: Were they in plain clothes or otherwise? A. Plain clothes.
 

 “Q. What happened in the Bel-Air Hotel parking lot? A. They said they were going up and get situated.
 

 ‘ ‘ Mr. Bansom: I object-
 

 ‘ ‘ Mr. Chandler: Stipulated it may go out.
 

 “Q. Did you have a conversation with the officer in the parking lot?
 

 “The Court: That is stricken out, what they said. Did you talk to them there? . . .
 

 Lynn on Cross-Examination by Mr. Bansom
 

 “Q. You have absolutely no recollection as to what year or month it was? A. No, sir.
 

 “The Court: Was it last May?
 

 “The Witness: No.
 

 “The Court: Was it this May?
 

 “The Witness: No, sir, before that.
 

 “The Court: Last May was May 1958.
 

 “The Witness: Yes.
 

 “The Court: How about the May before that?
 

 “The Witness: It could have been very easily, sir.
 

 “The Court: In your mind it was either May of 1956 or May of 1957?
 

 “The Witness: Yes, sir.
 

 “The Court: All right. The last question posed to you was the part of Danny in Night Must Pall was a principal role—as a matter of fact, it is the leading part, isn’t it? . . .
 

 “ Q. When did you next see Mr. Bobinson after this period, if you did ?
 

 “Mr. Chandler: Which period?
 

 “The Court: June to August 1, the middle of June to August 1, 1958, at least, that is where I am.
 

 “Mr Bansom: Yes, that is right.
 

 “The Court: After that period expired, which would be after August 1, 1958, when did you again see the defendant? . . .
 

 ‘ ‘ The Court: What did you talk about for three hours, you and Coster and the defendant?
 

 “The Witness: We didn’t talk, sir.
 

 “The Court: What did you do there, what was going on?
 

 “The Witness: Well, this is the time I took a skin pop on this night. . . .
 

 “Q. Now, as a matter of fact, it was Mr. Bobinson you believed—not that Mr. Bobinson had told anybody you were addicted to heroin—Mr. Bobinson had talked to Mr. Bagels about the fact—Mr. Bagels and Mr. Contoni about the fact that as a youth you had been in Tracy, isn’t that correct?
 

 ‘ ‘ Mr. Chandler: May I have that question read, if the Court please ?
 

 “The Court: The question was this: It was not that Mr. Bobinson had talked to Mr. Contoni, or whatever his name is, or Mr. Bagels about your being addicted to heroin, but it was because he had talked to them about your being in Tracy as a youth, and the witness answered yes, sir.
 

 
 *642
 
 "The Witness: No.
 

 "The Court: What did you say?
 

 "The Witness: I didn’t get a chance to answer.
 

 "The Court: What is your answer?
 

 1 ‘ The Witness: I have never been in Tracy.
 

 "The Court: Then your answer is no?
 

 "The Witness: Tes, sir.
 

 "Q. By Mr. Ransom: Let me put it this way—maybe I have some bad information. Mr. Robinson had discussed with Mr. Contoni not any purported addiction of yours to heroin, but rather discussed with him some juvenile difficulties that you had. A. No, sir.
 

 "Q. You never had any juvenile difficulties, is that right? A. Yes.
 

 " Q. You had had juvenile arrests, isn’t that correct ?
 

 ‘ ‘ Mr. Chandler: Just a minute, that is immaterial, if the Court please. It is material if this witness knew that-
 

 "The Court: It is immaterial and the objection is sustained. The witness said that that was not his reason for being disturbed by Mr. Robinson.
 

 Q. By Mr. Ransom: You believed it to be the report of heroin addiction rather than juvenile difficulties, is that correct? A. Yes, sir.
 

 "Q. Did your juvenile difficulties relate to heroin?
 

 "Mr. Chandler: Just a minute, if the Court please, that is immaterial. Object to it.
 

 "The Court: Sustained. . . .
 

 "Q. What did you say to Mr. Robinson and what did he say to you? A. I told him I had a friend of mine from out of town who was interested in buying some new albums. And I said I had heard he had some and they were terrific, and I would like to see if I could come up and maybe buy a $15 album.
 

 "Q. A $15 album? A. Yes, sir, and he said it would be fine. I said ‘When?’ He said, ‘When can you make it?’ And I said, ‘In the next 20 minutes.’ And he said ‘Fine.’
 

 "The Court: Did you say $15 or did you say fifteen cents?
 

 "Mr. Ransom: He said, ‘ Fif teen-cent paper’ the first time.
 

 "The Court: I am asking the witness, not you.
 

 "Mr. Ransom: I’m sorry.
 

 ‘ ‘ The Court: Did you say $15 or fifteen cents ? . . .
 

 " Q. As a matter of fact-
 

 "The Court: No, that is not what he just said. He said that the matter was mentioned several times and that it might have been ‘$15 album, $15 paper, fif teen-cent paper, fifteen cent album.’ He didn’t say that he mentioned ‘fifteen-cent paper’ several times. Go ahead. . . .
 

 "The Court: On those occasions, who was on the extension phone?
 

 "The Witness: Officer Fred Kalas.
 

 "The Court: Was that with your permission and consent?
 

 "The Witness: Yes, sir.
 

 "The Court: When did he go on the extension phone with respect to the telephone calls in which he was on the extension phone?
 

 "The Witness: As soon as I would dial and it started to ring, he would pick it up.
 

 "The Court: You could see him?
 

 "The Witness: Yes, sir.
 

 "The Court: How far away from you was he?
 

 "The Witness: Approximately 20 feet.
 

 "The Court: How many phone calls were initiated in that manner in which Mr. Kalas was on the extension phone?
 

 "The Witness: Four, sir.
 

 "The Court: Were they all from the same place?
 

 "The Witness: Yes, sir.
 

 "The Court: Where was that?
 

 
 *643
 
 "The Witness: The Hollywood Sheriff’s Station.
 

 "The Court: Were they all with your consent and permission?
 

 "The Witness: Tes, sir.
 

 "The Court: All right.
 

 "Q. By Mr. Ransom: With reference to your second visit to Mr. Robinson’s home, approximately how long were you there at that time? A. Half-hour, sir.
 

 "The Court: What day are you talking about now?
 

 "Mr. Ransom: That is the 13th of November.
 

 "The Witness: Tes. . . .
 

 Lynn on Be-Gross-Kxamination by Mr. Bansom
 

 "Q. Tou were relieved because you knew at that time that then you would be able to satisfy your indebtedness to Mr. Robinson? Is that correct? A. I had no indebtedness to Mr. Robinson.
 

 "The Court: We have gone all over that. Now you are starting back and going all over the same material twice.
 

 "Q. By Mr. Ransom: Tou have no way of knowing where the Sheriff’s officers that arrested—contacted you-—anybody in the narcotics squad or not, do you?
 

 "Mr. Chandler: Just a minute, may I have that question read?
 

 "The Court: How do you know it is objectionable?
 

 "Mr. Chandler: It sounded like it might be.
 

 "The Court: Tou don’t know what it is.
 

 "Mr. Chandler: No, I don’t; it sounded a little bit confused to me.
 

 ‘ ‘ The Court: The question was, you don’t know whether or not any of the persons in the Sheriff’s Office who arrested you contacted these officers or vice versa.
 

 "The Witness: No, sir.
 

 "The Court: Do you of your own knowledge know whether or not these officers, Kalas and Stamiesen, interceded with somebody in the Sheriff’s office to have the Court or the Probation Department or any other parties interested in whatever case you are on probation on, to go lightly?
 

 "The Witness: No, sir.
 

 "The Court: Tou don’t have any such knowledge?
 

 "The Witness: No, sir.
 

 "The Court: Is that what you had in mind, Mr. Ransom? . . .
 

 Officer Kalas
 
 —
 
 Direct by Mr. Chandler
 

 "The Witness: What is the question?
 

 "The Court: He asked you what you heard over the telephone.
 

 "The Witness: I first heard Mr. Lynn identify himself and ask-
 

 1 ‘ The Court: Let’s have the conversation, what Mr. Lynn and what the other party said.
 

 "The Witness: Mr. Lynn said, ‘Hello, is this Jay-’ this is to the
 

 best of my recollection. The party on the other end said, ‘Tes’ and I believe he asked who that was calling at that time, and Mr. Lynn stated, ‘ This is Rod. ’ He then stated that he would like to—he heard—he stated, ‘I heard that you have some new albums. I would like to come up and pick one up if I cau.’ Mr. Robinson stated, ‘Tes, I have-’
 

 ‘ ‘ The Court: Pardon me, do you know whether or not that was Robinson on the other end of the line?
 

 "The Witness: At that time, I did not, no sir.
 

 "The Court: Well, refer to the party at the other end of the line as the other party, and Mr. Lynn as Mr. Lynn. . . .
 

 Officer
 
 Kalas—
 
 Voir Dire by Mr. Bansom
 

 "Q. Did you see what number this witness dialed? A. Tes, sir. Mr.
 
 *644
 
 Lynn had written a number down and I placed it in my notebook. 1 watched him dial that number.
 

 “Q. Was that number known to you? A. Not at that time, no sir.
 

 “Q. Do you know who answered at the other end of the telephone? A. No, sir.
 

 “Q. You never at any time heard the voice of any answering party, is that correct? A. That is correct.
 

 “Q. You heard only what Mr. Lynn said? A. Yes, sir.
 

 “Mr. Hansom: I object to this officer’s testimony as to this conversation on the ground it is incompetent, irrelevant and immaterial; it doesn’t tend to prove any issues of this case.
 

 ‘1 Mr. Chandler: I think it does, if the Court please. As far as him hearing only one side of the conversation, he can so relate providing the portion of the conversation he hears is itself logical and relevant and makes sense.
 

 “The Court: Well, you had the witness Lynn here testify to what he said. Why should this witness tell us what Lynn said when Lynn already told us.
 

 “Mr. Chandler: Well, because it is corroboration of one witness or any witness.
 

 ‘ ‘
 
 Mr. Hansom: Bucking up, if the Court please.
 

 “The Court: Well, I will decide-There was a phone call that Lynn
 

 had with someone?
 

 “The Witness: Yes, sir.
 

 “The Court: Then where did you go after that?
 

 “The Witness: We went to 1416 Stone Canyon Hoad. . . .
 

 Officer Kolas
 
 —
 
 Direct by Mr. Chandler
 

 “Mr. Chandler: Do you stipulate as to voice and identity as to this?
 

 “Mr. Hansom: I will stipulate the officer will so testify.
 

 “Mr. Chandler: The People will accept the stipulation.
 

 “The Court: Well now, let me get this straight. You started out on the 12th which is at the West Hollywood Sheriff's Sub-Station, is that right?
 

 “The Witness: Yes, sir.
 

 “The Court: You went over to the Bel-Air Hotel?
 

 “The Witness: That is correct.
 

 “The Court: At which point the witness Lynn had a telephone conversation ?
 

 “The Witness: Yes, sir.
 

 “The Court: He dialed a number but you didn’t hear the other end of the conversation, is that right?
 

 “The Witness: That’s right, no, sir.
 

 “The Court: Then where did you go from there; did you go back?
 

 “The Witness: Prom that location we went up to the defendant’s residence, 1416 Stone Canyon Hoad.
 

 “The Court: Now you got him back to the West Hollywood Sheriff’s Sub-Station.
 

 “Mr. Chandler: Well, I would rather skip something, but I will fill it in anyway.
 

 ‘ ‘ Q. Let me ask you this, did you see any money change hands that day before Mr. Lynn went to the house?
 

 “Mr. Hansom: I will stipulate this witness is deemed to have testified that he gave Mr. Lynn three five-dollar bills upon which heretofore he had made notations of the serial numbers in a notebook—that he made notations in a notebook as to the serial numbers, and he gave the bills to Mr. Lynn.
 

 “Mr. Chandler: I can’t stipulate to that because, if your Honor please-
 

 “The Court: Well, let’s not be offering stipulations unless you know
 
 *645
 
 whether or not they are acceptable beforehand. Go ahead with your lawsuit. . . .
 

 “Q. Now, with respect to the late afternoon or early evening of the same day, the 12th of November, what transpired there, if anything? A. I returned to Mr. Lynn’s residence where I picked him up and transported him to the West Hollywood Sheriff’s Station.
 

 “The Court: You are still now on the 12th?
 

 ‘ ‘ The Witness: Yes, sir.
 

 “The Court: All right. Go ahead. . . .
 

 ‘
 
 ‘
 
 A. Mr. Lynn asked the defendant if he had contacted Ms connection yet. The defendant said no, that he had still been unable to get in touch with him. That he was sure he would have the stuff. I believe at this time the defendant used the word ‘grams.’ I am not positive whether he used that term at that time. He said that he would definitely have the grams for Mr. Lynn the next day before noon. He asked Mr. Lynn to call him again the next morning.
 

 “Q. What did Mr. Lynn say? A. Mr. Lynn agreed to this, and that was the substance of that conversation. . . .
 

 “Q. By Mr. Chandler: Go ahead. A. We then instructed Mr. Lynn to wait approximately 10 to 15 minutes and allow time for myself and my partners-
 

 “Mr. Ransom: I object to conversation between Mr. Lynn and this witness.
 

 “The Court: Overruled, — well, you conversed with him, is that correct ?
 

 “The Witness: Yes, sir.
 

 “The Court: Did you prearrange any signal with him?
 

 “The Witness: Yes, sir.
 

 “The Court: What was it?
 

 “The Witness: Made arrangements with Mr. Lynn that if he was successful in obtaining a quantity of narcotics, that upon Ms leaving the front door of the defendant’s house he would prop the door open and lean inside of the house.
 

 “The Court: Then where did you go after doing that or making that arrangement? Who left first and where did you all go? . . .
 

 “The Court: Did you leave Lynn down there at the Bel-Air Hotel, Lynn, as far as you know, was still at the Bel-Air?
 

 “The Witness: Yes, sir.
 

 “The Court: All right, go ahead.
 

 “The Witness: Sergeant Rodrigues observed Mr. Lynn’s signal.
 

 “Mr. Ransom: I object to what Sergeant Rodrigues observed. I know he had great powers, but I don’t think that is one of them, to observe what Sergeant Rodrigues saw.
 

 “The Court: Are you objecting? If so, on what ground?
 

 “Mr. Ransom: I am objecting to this witness testifying to what Sergeant Rodrigues saw.
 

 “The Court: What did you see Sergeant Rodrigues do?
 

 “The Witness: He honked the horn on the radio car, which was our pre-arranged signal between Sergeant Rodrigues and myself, that he had received the signal from Mr. Lynn. . . .
 

 Officer
 
 Kalas—
 
 Questioned Toy the Court
 

 “The Court: How long have you been on the narcotics work?
 

 ‘1 The Witness: A little over four years.
 

 ‘ ‘ The Court: How many arrests would you say you have made for violation of the Health and Safety Code, or how many arrests have you participated in in connection with the violation of this code?
 

 “The Witness: Well, I would estimate in the four years, roughly in the neighborhood of 1500 or 2000; that is just an estimation there.
 

 
 *646
 
 "The Court: You worked with other officers who had "been in the work for longer periods of time than you?
 

 "The Witness: Yes.
 

 "The Court: In the course of your work have you investigated cases, too?
 

 "The Witness: Yes, sir, I have.
 

 "The Court: Have you investigated many of them?
 

 ‘‘ The Witness: Quite a few, yes, sir.
 

 "The Court: Have you talked to narcotics addicts or users of narcotics?
 

 "The Witness: Yes, sir, I have.
 

 "The Court: Have you ever discussed with users of narcotics the manner in which they so used it?
 

 "The Witness: I have, yes, sir.
 

 "The Court: Have you heretofore seen in connection with your work paraphernalia ?
 

 "The Witness: Yes, sir.
 

 "The Court: Connected with the use of narcotics?
 

 "The Witness: Yes, sir, I have.
 

 "The Court: On how many occasions has that been?
 

 "The Witness: Again, just giving a rough estimation, I would say I observed the paraphernalia used by narcotics addicts somewhere around seven or 800 times.
 

 "The Court: Have you ever worked undercover and observed it used?
 

 "The Witness: Yes, sir, I have.
 

 "The Court: Do you have an opinion as to what those objects on Exhibit bag No. 3 mean to narcotic users, if any?
 

 "The Witness: Yes, sir, I have.
 

 "The Court: What is that?
 

 "The Witness: In my opinion, this is the paraphernalia of a narcotic addict, the paraphernalia used for the injection of narcotics.
 

 "The Court: How is it used? . . .
 

 "The Court: Why do they use a piece of Government money in lieu of any other kind of paper?
 

 "The Witness: It makes a very good gasket.
 

 "The Court: Washer?
 

 "The Witness: Washer, yes, sir.
 

 "The Court: All right, go ahead. . . .
 

 Officer Kalas
 
 —
 
 Cross-Examination iy Mr. Ransom
 

 "The Court: You testified, Mr. Kalas, on direct, I notice you used the word ‘goods.’
 

 "The Witness: Yes, sir, I did.
 

 "The Court: Were you quoting either one of the parties in that phone conversation when you used the word ‘goods,’ or is that a generic term that would 'include any physical object?
 

 "The Witness: I don’t believe the actual word ‘goods’ was used in these actual telephone conversations. . . .
 

 ‘ ‘ Q. (By Mr. Bansom) And you have told us some of the things he had told you. And when you heard these conversations, in your mind you were mentally prepared or mentally geared, were you not, to hear conversations about narcotics activities? A. Yes, sir.
 

 "Q. And being in that frame of mind, anything that you had heard in the past might have a secondary meaning, you would immediately have attached the secondary significance to that word, would you not? A. In this case in particular, Mr. Lynn had instructed me previously that the defendant did use-
 

 ‘ ‘ Mr. Bansom: Just a moment, I am sorry--
 

 "Mr. Chandler: If the Court please, I think the witness has a right to answer the question.
 

 
 *647
 
 "Mr. Hansom: That is not responsive.
 

 "Mr. Chandler: I think he should be permitted to go ahead and finish his answer instead of being chopped off in the middle.
 

 "Mr. Hansom: It is not responsive to the question, if your Honor please. The question is subject to a response of yes or no.
 

 "The Court: Well, maybe it isn’t. You are asking him whether or not he heard any word that to him, Halas, had a secondary meaning— would he not by virtue of his frame of mind attribute that very secondary meaning to the word as used by the party using it. Do you understand the question?
 

 "The Witness: Yes, sir.
 

 "The Court: Was that your frame of mind?
 

 "The Witness: Yes, sir. I don’t know if I can finish my answer or--
 

 "The Court: Well, you can.
 

 "Mr. Hansom: I think the District Attorney can explain on redirect if he wants to. You have answered the question to my satisfaction.
 

 "The Court: Do you want to explain your answer?
 

 "The Witness: I would like to, yes, sir.
 

 "The Court: Go ahead. . . .
 

 "The Court: What significance does that roll of adhesive tape have, if any, in the field in which you are working? Isn’t there a roll of adhesive tape there?
 

 "The Witness: Yes, sir, there is a roll of scotch tape or masking tape. Are you asking me what significance it has in this case?
 

 "The Court: Yes, what has that got to do with narcotic addiction?
 

 "The Witness: I believe it is the tape that was used to close the bindles. In other words, it was used to hold the bindles together. . . .
 

 Officer Stamiesen■—■Direct by Mr. Chandler
 

 "The Court: This is a cardboard carton, a cardboard carton with the Saran wrapper on the outside?
 

 "The Witness: That is correct.
 

 "The Court: Was any Saran Wrap in it?
 

 "The Witness: Yes, there was.
 

 "The Court: There was part of a roll in it?
 

 "The Witness: That is correct.
 

 "The Court: Was that one of these which is about a foot long and two inches square ?
 

 ‘ ‘
 
 The Witness: That is a fair description.
 

 "The Court: All right, you found that where, that Saran Wrap business?
 

 "The Witness: That was on the sink ledge on the left-hand side.
 

 "The Court: Go ahead. . . .
 

 "The Court: Still in the bedroom?
 

 "The Witness: Still in the bedroom of the location. I further asked him if he recalled selling a bindle for $15 to Mr. Lynn the day before. He stated, yes, that he did. . . .
 

 "The Court: Look at People’s Exhibit 3 and tell me and tell the jury whether you have seen the contents of that exhibit before, and if so, where.
 

 "The Witness: Yes, the contents of Exhibit 3 are the medicine dropper and the hypodermic needles that I have previously mentioned that I discovered in the Saran Wrap package in the bathroom of Mr. Bobinson’s house. Each of the items bear my initials, H. S., which I placed on them personally.
 

 "The Court: Do you know how that adhesive tape got into the exhibit?
 

 "The Witness: Yes, I taken the roll of adhesive tape along, which
 
 *648
 
 was found in the drawer immediately under the sink of the Bobinson bathroom. The purpose of my taking it was that it appeared to be very similar to the adhesive tape which was used to bind the bindle in People’s Exhibit No. 1 as evidence.
 

 “The Court: Is that the blue paper bindle?
 

 “The Witness: To the best of my recollection, yes.
 

 “The Court: Let’s refresh it. Take a look at it.
 

 “The Witness: Yes, it is still the very same type of adhesive on this package.
 

 “The Court: Because the bindle or package constituting People’s Exhibit No. 1 had that on it, you took possession of the scotch tape?
 

 “The Witness: That is correct.
 

 “The Court: Did you find the $15 that you had given Lynn the day before in the $262 that you say you recovered from Mr. Bobinson on the day after, to wit, November 13?
 

 “The Witness: I would have no way of knowing the $15. To the best of my recollection, I don’t recall recording the serial numbers of that $15.
 

 “The Court: You only recall ten $10 that you found on him?
 

 “The Witness: That is correct.
 

 “The Court: All right. . . .
 

 “The Witness: There are two types of tape on the package, brown tape and scotch tape, and also a plain tape or scotch tape.
 

 “The Court: What about the brown tape?
 

 “The Witness: The brown scotch tape is the tape that was on the bindles at the time of the arrest, and part of the writing and initials that was made on the bindles and still appear on the brown scotch tape.
 

 “The Court: What kind of tape is in the roll, the brown kind or the translucent kind?
 

 “The Witness: The brown type.
 

 “The Court: All right. . . .
 

 Officer Stamiesen
 
 —
 
 Voir Dire by Mr. Bansom
 

 “By Mr. Bansom: Q. This was all a part of the same conversation, Deputy Stamiesen? A. Yes, it was.
 

 “Mr. Bansom: All right, thank you; I have no further questions.
 

 Officer Stamiesen
 
 —
 
 Direct by Mr. Chandler
 

 “Mr. Chandler: Proceed, Mr. Stamiesen.
 

 “The Court: This is the conversation in the bedroom?
 

 ‘ ‘ The Witness: That is correct.
 

 “The Court: That is where you exhibited People’s Exhibit No. 3 as well as where you counted out the money or cheeked the money against the numbers, is that right?
 

 “The Witness: That’s right.
 

 “The Court: Was anybody else in there beside you and Bobinson, the defendant?
 

 “The Witness: I believe that as part of the conversation I am about to relate, I believe my partner, Deputy Kalas, was there at that time. . . .
 

 “The Court: You used the word ‘fix. ’ Who used the word ‘fixed’ in that conversation, you or Mr. Bobinson?
 

 “The Witness: The word was used by both myself and Mr. Bobinson.
 

 “The Court: What does the word ‘fix’ mean in narcotics parlance?
 

 “The Witness: To prepare an injection illegally, inject a narcotic.
 

 “The Court: Is it used both as a noun and a verb such as ‘a fix’ or ‘I fix myself,’ or ‘he fixed me?’
 

 “The Witness: It would be used the same way, yes.
 

 “The Court: Both a noun and a verb?
 

 “The Witness: That is correct, as I understand the way you placed the question. . . .
 

 
 *649
 

 Officer Stamiesen
 
 —
 
 Cross-Examination by Mr. Bansom
 

 “Q. But there was nothing placed in there about Mr. Robinson, any misdemeanous activity, if I may use that word, of Mr. Robinson? A. To the best of my knowledge, no, it wasn’t.
 

 “The Court: What are you talking about? What did you find?
 

 “The Witness: Puncture wounds indicative to that of recent illegal use of narcotics.
 

 “The Court: On whom?
 

 “The Witness: On Mr. Robinson and Mr. Foster.
 

 “The Court: Where on Mr. Robinson?
 

 “The Witness: On the inner elbow area immediately over the main vein. . . .
 

 Officer Stamiesen
 
 —
 
 Bedirect by Mr. Chandler
 

 “The Court: How many puncture marks did you see starting with number one to infinity—one, two, three, four, how many?
 

 “The Witness: As I can recall, there were at least ten puncture wounds. . . .
 

 “The Court: Marks is not a misdemeanor; addiction is, isn’t that right?
 

 “The Witness: Addiction is.
 

 “The Court: Marks might be evidence of addiction, is that right? . . .
 

 Officer Stamiesen
 
 —
 
 Becross by Mr. Bansom
 

 “The Court: Who do you make an arrest report for?
 

 “The Witness: The copies? Who do the copies go to?
 

 “The Court: You make a report. What do you do with it? . . .
 

 “Q. And you said to Mr. Robinson in reference to the needles and the spoon, ‘ These are the needles and the spoon, and this is the outfit you used in fixing,’ is that correct? Isn’t that substantially what you said? A. (No audible response.)
 

 “The Court: Did you say it by declarative sentence ‘These are the needles that you used. ’ Or did you ask him by an interrogative sentence, ‘Are these the needles that you used9’ That is what the man is asking you.
 

 “The Witness: It was asked in question form, ‘Are these the needles?’ Or, ‘Is this the equipment or outfit that you used?’ . . .
 

 Defendant
 
 —
 
 Direct by Mr. Bansom
 

 “The Court: How old is Cantoni?
 

 “The Witness: How old is he?
 

 “The Court: How old was he at the time in San Francisco?
 

 ‘ ‘ The Witness: Cantoni?
 

 “The Court: Yes.
 

 “The Witness: I would say a man in Ms late twenties. . . .
 

 Coster
 
 —
 
 Direct by Mr. Bansom
 

 ‘ ‘ Q. By Mr. Ransom: Did Mr. Robinson admit Mr. Lynn to his home ? A. Yes, he did.
 

 “The Court: Then what happened?
 

 “The Witness: Then we just had a regular social talk about the theater.
 

 “The Court: Who did?
 

 “The Witness: The three of us, myself, Mr. Robinson-
 

 “The Court: What was it; give us the talle.
 

 “The Witness: Well, it was just about—well, Mr. Robinson was saying that he was staying with a friend and he was unemployed at the time, and the conversation just went on about the theater, about different plays, things like that.
 

 “The Court: What plays were you talking about?
 

 “The Witness: Well, we were discussing quite—several plays, as a
 
 *650
 
 matter of fact—like I was reading ‘Night Must Fall. ’ We were discussing different characters in that. Plus Mr. Robinson was discussing about going to New York to do a play.
 

 “The Court: What did Lynn say?
 

 “The Witness: Well, he was in the conversation talking about different theatrical things that he hoped — he had a picture coming up in the future. . . .
 

 Coster
 
 —
 
 Gross-Sccmnination ~by the Court
 

 “Mr. Chandler: I have nothing further.
 

 “Mr. Ransom: I have nothing further. You may step down.
 

 “The Court: Just a minute. This first occasion you met Mr. Lynn, do you see him here today? Is he here9
 

 (Witness looks around courtroom.)
 

 “The Witness: That is Mr. Robinson here.
 

 “The Court: Where?
 

 “The Witness: No, that is not Mr. Rodlin. I don’t see Mr. Rodlin.
 

 “The Court: Are you here, Mr. Lynn?
 

 “Mr. Chandler: Mr. Lynn, stand up- (No response.)
 

 “Mr. Chandler: He is not here.
 

 “The Court: Let the record show he is not here. On the first occasion that you met him, you say that was at the Huntington-Hartford Theater?
 

 “The Witness: That’s right.
 

 “The Court: Do you remember that occasion; do you remember it?
 

 “The Witness: Yes.
 

 “The Court: That was last October?
 

 “The Witness: It was about the end of October, yes.
 

 “The Court: What was the play there at that time? Do you recall?
 

 “The Witness: Yes, it was Jose Ferrer in ‘The Booth.’
 

 “The Court: The what?
 

 “The Witness: ‘The Booth’—‘The Booth Story,’ the play was, I believe you call it.
 

 ‘1 The Court: It was the story about-
 

 “The Witness: About the Booth. Mr. Robinson played the part of John Booth.
 

 “The Reporter: Mr. Who?
 

 “The Witness: I’m sorry, Mr.
 
 Ferrer.
 

 “The Court: Did you see that play that night?
 

 “The Witness: Yes, I did.
 

 “The Court: Was it about John Booth?
 

 “The Witness: It was about the whole Booth family, all of the Booths.
 

 “The Court: John Wilks [sic] Booth, Edwin Booth?
 

 “The Witness: Yes.
 

 “The Court: Junius Brutus Booth?
 

 “The Witness: Yes.
 

 “The Court: And so forth?
 

 “The.Witness: Yes, that’s right.
 

 “The Court: Was it before the show or after the show, after the performance that you met Mr. Lynn?
 

 ‘ ‘ The Witness: It was during the intermission.
 

 “The Court: Where were you—I don’t want to be unfair; have you got a visual picture in your mind of the intermission, the break in the show?
 

 “The Witness: Yes, it was upstairs in the lobby.
 

 “The Court: Do you know whether this was a two-act play or a three-act play?
 

 “The Witness: It was a two-act play.
 

 “The Court: This was between the first and second acts?
 

 
 *651
 
 "The Witness: Between the first and second acts.
 

 "The Court: At what theater?
 

 "The Witness: At the Huntington-Hartford.
 

 "The Court: You had gone there, I take it, with Mr. Bobinson, had you?
 

 "The Witness: That’s right.
 

 ‘ ‘ The Court: What took place when the intermission came ? What did you and Bobinson do, tell me about it.
 

 "The Witness: We were out in the Lobby. Mr. Bobinson was having a drink and Mr. Bodlin was with a friend and approached us, and Bodlin had said, ‘How are you, Jay,’ something like that; and I was introduced.
 

 "The Court: You were introduced?
 

 "The Witness: Yes, I shook his hand, and he introduced me as Mr. Coster.
 

 ‘ ‘ The Court: How long had you known Mr. Bobinson before you went to live at his house?
 

 "The Witness: About a week and a half.
 

 "The Court: And where had you met him?
 

 ‘ ‘ The Witness: At a party.
 

 "The Court: Was that a party to which you were each invited as guests, or did he give the party or did you give the party?
 

 "The Witness: I don’t believe Mr. Bobinson gave the party. I just met Mr. Bobinson at the party.
 

 "The Court: It was a party that was being hosted by some third party?
 

 "The Witness: That’s right.
 

 ‘ ‘ The Court: After that party, when did you next see him ?
 

 "The Witness: It was the following day.
 

 "The Court: Where?
 

 ‘ ‘ The Witness: Mr. Bobinson came over to my apartment.
 

 "The Court: That was the day after you first met him?
 

 "The Witness: Yes.
 

 ‘ ‘ The Court: Then when did you see him again ?
 

 "The Witness: The following day.
 

 "The Court: Where?
 

 "The Witness: I called Mr. Bobinson up the following day and we went out to dinner.
 

 "The Court: That very day?
 

 "The Witness: It was approximately two days after I met him, two or three days.
 

 "The Court: You met him on the first day; it was in the evening, wasn’t it?
 

 "The Witness: That’s right.
 

 "The Court: And he came to your apartment the next day, is that correct ?
 

 "The Witness: Correct.
 

 "The Court: And the next day you went out to dinner together?
 

 "The Witness: That’s right.
 

 "The Court: How about the next day?
 

 ‘ ‘ The Witness: I am not quite sure of the days, I mean, I don’t-
 

 ‘ ‘ The Court: Are you sure that those three successive days—there were three successive incidents: You met him on the evening of Day One; a visit to your apartment on Day Two; a telephone call and a dinner engagement on Day Three, is that a correct statement?
 

 "The Witness: Well, if there was a day or two in between there, I am not quite positive.
 

 ‘ ‘ The Court: Assuming they were separated other than by being a day apart, did you have any more meetings with him until you went to live at his house?
 

 "The Witness: I met Mr. Bobinson on several occasions, I mean
 
 *652
 
 before I moved into Ms house, approximately four or five times before I moved into his house.
 

 “The Court: Well, you told us about three of them.
 

 “The Witness: Yes, there Tyere a few more.
 

 ‘ ‘ The Court: Where were the other two 9
 

 “The Witness: At my apartment where I was living.
 

 “The Court: He eame to visit you?
 

 “The Witness: Yes, I called him up and he stopped by.
 

 “The Court: And how many times did he stop by at your apartment before you went to live at his house?
 

 “The Witness: Possibly twice.
 

 ‘ ‘ The Court: Then how long a time had elapsed between the last time he visited at your apartment when you called him to tell him about your plight of being out of money and out of work?
 

 “The Witness: A few days.
 

 “The Court: How long a time had elapsed between the time you first met Mr. Robinson at this party and when you moved into his house?
 

 “The Witness: Approximately two weeks.
 

 “The Court: Did you play the part of Danny in 'Night Must Fall’?
 

 “The Witness: I practiced it, yes.
 

 “The Court: Did you ever talk to Lynn about his playing that part?
 

 “The Witness: No.
 

 “The Court: He never mentioned it?
 

 “The Witness: No, never talked about it.
 

 “The Court: Well, this night that you had this discussion when Lynn came over and you say there was theatrical talk, didn’t that play come up, ‘Night Must Fall’?
 

 “The Witness: That play came up; several other plays eame up. We were just discussing them because at the time Mr. Rodlin was there, I was reading the play.
 

 “The Court: Did you know Mr. Robinson once played that part?
 

 “The Witness: Yes.
 

 “The Court: You were reading the play?
 

 “The Witness: Yes, I was reading it.
 

 “The Court: By that you mean you were considering the part, isn’t that correct, practicing for the part, rehearsing for the part?
 

 ‘1 The Witness: Practicing it, yes.
 

 “The Court: That was never mentioned that night that Lynn eame up there to the house?
 

 “The Witness: That I was reading it, you mean?
 

 “The Court: Yes, the play, ‘Night Must Fall.’
 

 ‘ ‘ The Witness: That play plus several other plays we were discussing.
 

 “The Court: Lynn never mentioned that he had done the part himself?
 

 “The Witness: No, I wasn’t paying too much attention. I did not— I was not too much in the conversation about the theatrical world. I was reading the play. I was not too well associated with this Mr. Lynn.
 

 “The Court: Weren’t you a part of this conversation?
 

 “The Witness: Not a very big part, no.
 

 “The Court: Who all were there beside you, Robinson and Mr. Lynn?
 

 “The Witness: That is all, just the three of us.
 

 “The Court: Were you actually, physically engaged in doing something else other than sitting in the room?
 

 “The Witness: That is all.
 

 “The Court: But you didn’t contribute to the conversation or listen to it, is that a fair statement?
 

 “The Witness: Well, I was listening to it and reading, back, and forth.
 

 “The Court: Did you play any records?
 

 “The Witness: Yes, we played records.
 

 
 *653
 
 "The Court: What was it you played?
 

 "The Witness: Well, Giant, yes Giant.
 

 "The Court: What is that show the music is from, Giant?
 

 "The Witness: The Music from Giant, East of Eden, and Rebel Without Cause.
 

 "The Court: What else?
 

 "The Witness: There is a couple of, I think a record called Side Track by Gogi Grant.
 

 "The Court: Do you remember any other?
 

 "The Witness: Well, there was a couple by Frankie Lane, some by Sinatra. There was a selection of records.
 

 "The Court: Do you recall any more?
 

 "The Witness: No, that’s all I recall.
 

 "The Court: Do you recall Lynn having any interest in the records, Rodney Lynn?
 

 "The Witness: Well, Rod Lynn and Mr. Robinson were talking about records, yes.
 

 "The Court: Were they talking about any particular records?
 

 "The Witness: Not to my knowledge; records in general.
 

 "The Court: How long would you say Lynn was there?
 

 "The Witness: At what visit.
 

 "The Court: There were two visits, were there not?
 

 "The Witness: Yes, approximately, no more than two hours.
 

 "The Court: And on the second occasion, that was how much later?
 

 ‘ ‘ The Witness: What do you mean by how much later, in the days ?
 

 "The Court: In point of time, was it days?
 

 "The Witness: Within two days.
 

 "The Court: What time of the day was that?
 

 "The Witness: It was in the morning.
 

 "The Court: What time in the morning?
 

 "The Witness: I would say around eleven o’clock, around ten or eleven o’clock.
 

 "The Court: Was Mr. Robinson’s mother living there in the house when--
 

 "The Witness: No, she was not; she was in Burlingame, as far as I know.
 

 ‘ ‘ The Court: Did Lynn come to the house alone ?
 

 " The Witness: Yes.
 

 "The Court: Who all were there when he arrived?
 

 ‘ ‘ The Witness: Just Mr. Robinson and I.
 

 I ‘ The Court: What happened then ?
 

 "The Witness: Well, Mr. Lynn—Mr. Robinson answered the door. I was sitting down and Rod Lynn came in and sat down. We were just talking.
 

 ‘ ‘ The Court: What did you talk about ?
 

 "The Witness: I was not too much in on the conversation, again, I was reading.
 

 " The Court: You were reading ?
 

 II The Witness: Yes.
 

 "The Court: Do you remember what you were reading?
 

 "The Witness: Well, if I am not mistaken, there were several things. I have been reading several books. I was going over the script from ‘The Robe,’ Jay’s script. I was going through that and other reading matter.
 

 ‘ ‘ The Court: Did you have in mind at that time, were you anticipating playing a part in ‘ The Robe ’ ?
 

 "The Witness: No, I just wished that I could have had the part at the time.
 

 ‘ ‘ The Court: At what time ?
 

 ‘ ‘ The Witness: When ‘ The Robe ’ was made.
 

 
 *654
 

 ‘
 
 ‘The Court: What part would you have liked to have had?
 

 ‘ ‘ The Witness: The part of Caligula.
 

 ‘ ‘ The Court: How old are you ?
 

 ‘ ‘ The Witness: Twenty-two.
 

 ‘
 
 ‘
 
 The Court: When was ‘ The Robe ’ made ?
 

 ‘ ‘
 
 The Witness: Oh, I would say approximately five years ago.
 

 ‘ ‘ The Court: Lynn came in; what did you do 9 ‘‘The Witness: Well, they came in and said, ‘Hi.’
 

 ‘ ‘
 
 The Court: Who are they?
 

 “The Witness: I mean Bodlin said ‘Hi,’ to myself, and he was talking to Mr. Robinson on the sofa.
 

 ‘1 The Court: You didn’t enter into the conversation 9 “ The Witness: No.
 

 ‘1 The Court: How long were they engaged in conversation?
 

 1 ‘ The Witness: Oh, about an hour and a half.
 

 “The Court: Were they always on the sofa?
 

 '
 
 ‘
 
 The Witness: They were on the sofa, yes.
 

 ‘
 
 ‘The Court: And were you always nearby?
 

 ‘ ‘
 
 The Witness: Yes, I was in the same room.
 

 “The Court: But you were engaged in reading, is that correct?
 

 ‘1 The Witness: That’s correct.
 

 “The Court: You looked over some reading material, including the script for
 
 ‘
 
 The Robe ’ 9
 

 “The Witness: That’s right.
 

 “The Court: You don’t remember that conversation, is that correct?
 

 ‘ ‘ The Witness: That is—the conversation they were having personally, no, I do not remember the conversation.
 

 “The Court: Was their conversation somewhat continuous, by that I mean did first one talk and then the other ? Was there a steady flow of chatter or talk for an hour and a half?
 

 “The Witness: No, it was not a steady flow, no. It was broken up by looking at different things. I guess I was not paying too much attention whether the conversation was a steady flow or not.
 

 ‘
 
 ‘
 
 The Court: But you do remember that Lynn out of that hour and a half’s conversation, that Lynn said, ‘I am getting a check,’ or words in substance as follows, ‘I am getting a check and I will pay you back the money I owe you. ’
 

 ‘ ‘
 
 The Witness: This was as Bodlin was leaving, yes.
 

 ' ‘ The Court: That you remember 9 “The Witness: Yes.
 

 “The Court: Can you tell us anything else he said9 ‘ ‘The Witness: Because at the time I had stood up for courtesy.
 

 “Mr. Bansom: Pardon me, I didn’t get that, you stood up for courtesy? ‘ ‘ The Witness: I did not want them to feel that I was ignoring them one hundred per cent, so as Mr. Bodlin stood up, I stood up and was going to bid good-bye, as far as that went.
 

 1 ‘The Court: All right, have you got anything else?
 

 ‘ ‘
 
 Mr. Ransom: That’s all. . . .
 

 Buskin
 
 —■
 
 Direct iy Mr. Bansom
 

 ‘ ‘
 
 Mr. Ransom: I would propose to show by this witness that Mr. Lynn not only had the opportunity to obtain narcotics someplace else when he was out of sight of these deputy sheriffs for some period of time, but also had the opportunity to conceal narcotics on his person.
 

 “The Court: But that is argument. You don’t prove that by a witness. He could have had them in his anal opening, he could have had them in his nostrils, he could have had them in his shoes, he could have had them
 

 in his socks, he could have had them in his ears--
 

 “Mr. Ransom: That is what I am trying to show.
 

 “The Court: He could have had them taped in his umbilical cord de
 
 *655
 
 pression; he could have had them in the hair on his chest. I don’t think that is a subject of expert testimony.
 

 “Mr. Bansom: I think the Court has made my point. All right, Your Honor. . ..
 

 Defendant
 
 —
 
 Cross-Examination 6y Mr. Chandler
 

 ‘ ‘
 
 The Court: What did he want the first time he called?
 

 “The Witness: I think he said something about—on the 12th now, you are referring to ?
 

 “The Court: Yes.
 

 “The Witness: I think he said something about wanting to listen to a record, or something.
 

 ‘ ‘
 
 The Court: What did you tell him ?
 

 “The Witness: I think—I don’t know whether I said to call back later or he said something about calling back later, but I had company and I wasn’t really paying that much attention to what was said, but I know there was some reference to a record.
 

 ‘ ‘
 
 The Court: He called up again on the 12th ?
 

 “TheWitness: Yes.
 

 1
 
 ‘
 
 The Court: Did he indicate for what purpose ?
 

 “The Witness: I think it had something to do with listening to this record album that related to my appearance in the play in the sense that it was by the same man who was going to produce a play, and who had written the play.
 

 “The Court: Well then, after that he came by, is that your statement?
 

 1
 
 ‘
 
 The Witness: On the 12th ?
 

 “The Court: Yes.
 

 ' ‘ The Witness: Yes, he came by.
 

 “The Court: You had these Noel Coward records—had you recently acquired them with respect to November 12—had you recently acquired these records of Noel Coward?
 

 ‘ ‘
 
 The Witness: I had acquired some of them and some other records.
 

 “The Court: And you acquired those because you were about to be cast in a role in a play written by Noel Coward and to be produced by him ?
 

 “The Witness: Actually, your Honor, Noel Coward has been my idol ever since I was a small boy and I had all his books and some of his records, and I had recently acquired several more of his records.
 

 “The Court: You indicated a bit ago, and I perhaps misunderstood you, that these records had a particular pertinence at this particular time on this particular date, to wit, November 12, by virtue of the fact that you had captured or you had been assigned a part in a New York production of his ?
 

 ‘ ‘
 
 The Witness: Yes.
 

 ‘ ‘ The Court: To be directed by Charles Bussell ?
 

 “The Witness: To be produced by Mr. Bussell and to be directed, I believe, by Mr. Coward. I had received a call-
 

 ‘ ‘
 
 The Court: A play written by Mr. Coward?
 

 ‘ ‘
 
 The Witness: Yes.
 

 “The Court: Well, what was there about those three records that gave them any significance to Lynn back here on November 12, can you tell me that?
 

 “Mr. Bansom: If the witness knows. I mean-
 

 “The Court: Well, if he doesn’t know, I can’t put anything in his mouth he doesn’t know.
 

 “The Witness: I don’t know what particular significance they would have had with Mr. Lynn. They had great significance to me.
 

 “The Court: All right, let me put it this way. Perhaps I misunderstood you. Why, when you mentioned the phone calls of the morning
 
 *656
 
 of November 12 preceding the appearance of Lynn at your house—do you follow me 9
 

 ‘ ‘
 
 The Witness: Yes.
 

 ‘1 The Court: Why did you mention to us first that you were cast in a Noel Coward play which was about to be directed or produced by Noel Coward? Why did you mention that in connection with these Noel Coward records—was it a coincidence 9
 

 “The Witness: In a sense, yes. I received a call the night before from Mr. Bussell, and the thing is very fresh in my mind.
 

 “The Court: Did Lynn want to hear the Noel Coward records9
 

 “The Witness: I have extensive correspondence from Mr. Bussell-
 

 “The Court: I understand that. I am not doubting the fact that you got the part, but did Lynn ask
 
 you
 
 if you got Noel Coward and Gerty and Noel Coward in New York to play? What significance does the mention of Noel Coward’s records have with reference to the November 12 phone call?
 

 “The Witness: I don’t know what the significance is here.
 

 “Mr. Chandler: If the Court please, I believe the witness is testifying to the 13th. Mr. Bobinson may possibly be confused because actually the testimony-
 

 ‘ ‘ The Court: I thought we were talking about the 12th.
 

 ' ‘ Mr. Bansom: We are.
 

 “Mr. Chandler: There was one conversation, if my memory serves me correctly, on the 12th by Mr. Lynn. Following the conversation, of course, he went to the house later in the day. After he had visited the house there were further calls, and, of course, the next day there were several phono calls before he made the visitation.
 

 “Mr. Bansom: I think the exigencies of the situation has got Mr. Bobinson confused. He is talking about the 13th.
 

 “The Court: All right, the Court has no desire to confuse anybody at all. I simply want to know this
 
 from you, Mr.
 
 Bobinson: Did Mr. Lynn express to you in a phone conversation or otherwise on the 12th or the 13th, any interest in these recordings of Noel Coward?
 

 “The Witness: I don’t believe he mentioned the name Noel Coward. Just something about 'terrific record,’ or 'those are some terrific records,’ or some mention of records—wanting to hear some terrific records, or that was á terrific record, or something of that nature.
 

 “The Court: Was that on the phone?
 

 ‘1 The Witness: Yes, I believe it was.
 

 “The Court: Was it indicated in any of these phone calls that he wanted to hear the Noel Coward record, either on the 12th or after he left your house, or on the 13th before he came to your house—was anything mentioned about the Noel Coward’s records on the phone?
 

 “The Witness: You mean specifically, Noel Coward?
 

 “The Court: Yes, Noel Coward.
 

 “The Witness: No, sir, not that I remember, nothing in relation to the name Noel Coward, on the phone-—it may have been, I am not sure.
 

 1 ‘ The Court: You say it may have been ?
 

 “The Witness: The name Noel Coward might have been mentioned, but I don’t recall it now. . . .
 

 “The Court: How long does it take to play one side of a 33% record?
 

 “The Witness: I wouldn’t know exactly. I suppose 15 minutes, or something. Don’t know whether I listened to all of it or not.
 

 “The Court: If you listened to it from beginning to the end, can you tell us how long you would be listening, if you listened to all of it?
 

 “The Witness: I couldn’t say exactly—you mean one side of a long-playing record 9
 

 “The Court: Yes, of the kind that you had, involving Noel Coward, one side of one of those records, how long would it take to play?
 

 
 *657
 
 "The Witness: Possibly about 15 minutes, maybe less or more, I am not sure. ...
 

 Lynn
 
 —
 
 Cross-Mxamination on Rebuttal by Mr. Ransom
 

 "Q. by Mr. Ransom; You have been doing everything you can to help Mr. Robinson get convicted since this trial started?
 

 "Mr. Chandler: I object to that as argumentative.
 

 "The Court: Objection sustained. Haven’t you some other question to ask this witness? . . .
 

 Lynn
 
 —
 
 Cross-Mxamination by Mr. Ransom
 

 "Q. by Mr. Ransom: You have given them whatever help you could to proceed along these lines, haven’t you?
 

 "Mr. Chandler: I object to that as argumentative.
 

 "Mr. Ransom: I want to show bias and prejudice of the witness.
 

 ‘ ‘
 
 The Court: You are asking him if he is giving-
 

 "Mr. Ransom: If he has not participated actively in the conduct of this trial since it started out.
 

 ‘ ‘
 
 The Court: I think that is obvious to the jury.
 

 "Mr. Ransom: All right, that is all. I have no further questions.
 

 ‘' The Court: Participation is what the jury has seen.
 

 ‘ ‘
 
 Mr. Ransom: Both on and off the witness stand.
 

 ‘ ‘
 
 The Court: What ?
 

 "Mr. Ransom: Both on and off the witness stand, is what I am referring to.
 

 "The Court: What do you mean by participating; what do you have in mind?
 

 "Mr. Ransom: I have in mind contacting witnesses; I have in mind going to and from the courtroom with the deputy sheriffs; I have in mind his coming forth here on more than one occasion that I can personally testify to to aid and abet the prosecution. I am just showing active participation in an apparent desire to see Mr. Robinson convicted, which goes to show bias and prejudice on the part of the witness.
 

 "The Court: The jury can figure that out, that he is a witness adverse to your client, that’s for sure. . ..
 

 Officer Kalas
 
 —
 
 Rebuttal
 
 —
 
 Redirect by Mr. Chandler
 

 ‘ ‘
 
 Q. Why wasn’t it contained in the report?
 

 "Mr. Ransom: To which I object as incompetent, irrelevant and immaterial.
 

 "Mr. Chandler: We have a reason, and since he brought this out, I believe it is proper for us to show the reason it was not included in the report.
 

 "The Court: Can you give a reason why you did not include it in your report?
 

 11 The Witness: Yes, sir.
 

 ‘1 The Court: What was the reason?
 

 ‘ ‘ The Witness: This was confidential information and was withheld from the report as the report is available—sometimes the press gets ahold of the report, and we did not want anyone outside of the Department know that the defendant had agreed to work with us.
 

 '
 
 ‘
 
 The Court: All right.
 

 "Mr. Chandler: That’s all.’’
 

 [1]
 

 See end of opinion for footnote 1, page 639.