Filed 6/25/21  P. v. Dorsett CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP DORSETT,<br><br>    Defendant and Appellant. | B294926<br><br>(Los Angeles County<br>Super. Ct. No. YA062761) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge.  Reversed.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Susan S. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Phillip Dorsett of second degree murder and found true the allegation that he personally used a firearm in the commission of the offense. The trial court sentenced him to an aggregate term of 40 years to life in state prison.

On appeal, Dorsett contends the trial court committed judicial misconduct by repeatedly disparaging defense counsel and interjecting improper questions and comments to the witnesses in a manner that deprived him of a fair trial. We agree the trial court's conduct rose to the level of judicial misconduct. Finding the error prejudicial, we reverse the judgment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

On June 17, 2005, Dorsett shot and killed Jesse Fujino, an Evil Klan gang member known as "Raton" or "Mousey." Fujino was with Abel Soto, another Evil Klan member, and Sergio Soto, a tagging crew member, when he was shot.

Following an initial jury trial, Dorsett was acquitted of first degree murder and convicted of second degree murder. On direct appeal, we reversed the jury's finding of a gang enhancement, concluding the evidence was insufficient to support the allegation. (*People v. Dorsett* (June 11, 2009, B204123) [nonpub. opn.].) The conviction was vacated after the Ninth Circuit Court of Appeals granted Dorsett's habeas petition due to ineffective assistance of counsel.[2]

---

[1] In light of our disposition, we do not address Dorsett's other contentions.

[2] The circuit court concluded that trial counsel erred by failing to interview Abel Soto, who provided a declaration corroborating Dorsett's claim of self-defense. (*Dorsett v. Uribe* (Apr. 17, 2015, No. 13-56123) 2015 WL 1742185.)

At Dorsett's second trial, he claimed he shot Fujino in self-defense. Many of the witnesses had been questioned by police at least once and previously had testified at the first trial. The retrial largely focused on discrepancies among the various statements and testimony provided by the witnesses.

## A. Prosecution Evidence

The following individuals were with Dorsett (a.k.a. Chino) at the time of the shooting: Manuel Corrales, Victor Torres, Augustin Cortez, Myra Hernandez, Jasmine Hermosillo, and Karina Hermosillo.[3] With the exception of Karina, all of them, including Dorsett, were members of the Muertos gang.

### 1. *Jasmine's Testimony*

#### a. <u>Description of the shooting</u>

Jasmine testified that in June 2005, she was 15 years old. On the evening of June 17, 2005, Jasmine and her 17-year-old sister, Karina, visited Jasmine's friend Myra on 95th Street in Los Angeles. Jasmine and Karina joined Myra outside her apartment building, where she was drinking with Dorsett, Cortez, Corrales, and Torres. At some point, the group moved to Dorsett's blue van and continued to "hang[ ] out inside the van."

---

On our own motion, we take judicial notice of the circuit court's decision, and our prior decision from Dorsett's first appeal. (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1); see *Fink v. Shemtov* (2010) 180 Cal.App.4th 1160, 1171, 1173 [a court may take judicial notice of prior unpublished opinions in related appeals on its own motion].)

[3] Because the following witnesses share the same last names, we refer to them by their first names: Jasmine Hermosillo, Karina Hermosillo, Myra Hernandez, and Dennis Hernandez.

While seated inside the van, Jasmine saw a man come from the direction of Myra's apartment building and walk behind the van, where he urinated.  The man approached the open sliding door of the van, and asked, "Where you guys from?"  Someone in the van, possibly Dorsett, replied, "Muertos."  The man said he was from "EK."  As the man questioned the Muertos group, two men who appeared to be his friends walked away.  The man also walked away.

At some point, Dorsett exited the van and walked up to the man who had asked "where are you from" and began to argue with him.  Everyone else got out of the van.  Dorsett and the man were arguing loudly on the sidewalk, standing only inches apart and facing each other.  Jasmine could not recall any of the words they exchanged, but observed they were angry.  The man's friends were standing about 40 feet from the van; they did not say anything while Dorsett and the man argued.

At one point, Jasmine saw Dorsett with a gun; she did not see anything in the other man's hands.  Dorsett pointed the gun at the man's face, close to the man's head.  Jasmine began running toward Myra's apartment.  While running, Jasmine heard one gunshot and turned around.  She saw Dorsett with the gun and the man down on the ground.  Jasmine then saw Dorsett run to his van and drive off with Corrales.

b.     Jasmine's statements to police a week after the shooting

One week after the shooting, the police interviewed Jasmine at the police station.  The investigating officer testified that during the interview, Jasmine stated that the man who had asked the group where they were from was "acting tough," while his two friends were "mad-dogging" the group and looking "hard" at everyone.   She identified a photograph of Abel Soto as the man she

saw urinating behind Dorsett's van. She told the officer that she only turned around after hearing a gunshot and that was when she saw Dorsett with a gun. In response to further questions, she said she saw Dorsett shoot Fujino one time and saw Fujino fall backward onto the ground.

2. *Karina's Testimony*

a. Trial testimony

In June 2005, Karina was 17 years old. She was not a member of the Muertos gang.

On the day of the shooting, she was present in Dorsett's van when a man walked up and asked, "Where you guys from?" Dorsett responded, "This is Muertos." The man identified himself as "Mousey." When Mousey approached the van, there were two males behind him, about eight feet away. All three were "mad dogging" the group.

Mousey walked to the back of the van and urinated. Everyone got out of the van, including Dorsett, who "looked mad."

Dorsett and Mousey walked toward each other and began arguing "face-to-face." Dorsett lifted his right hand, which held a gun, and said "This is Muertos." Dorsett shot Mousey on the right side of the head and Mousey fell to the ground. Mousey did not have a gun; nor did he try to punch Dorsett prior to the gunshot. Karina heard "[j]ust that one" gunshot and started to run.[4] As she ran she saw Dorsett drive away in his van with the three male friends.

---

[4] At the preliminary hearing, Karina testified she could not remember how many shots were fired, but it was more than one and that she ran after she heard the first shot. At the first trial, Karina testified she could not recall how many shots were fired.

### b.  Karina's statements to police

The police interviewed Karina the same day as Jasmine.  At trial, she explained she did not want to be involved so she initially lied to the officers.  During the first interview, she denied seeing the shooting.  During the second interview, she stated she did not see Dorsett shoot Mousey, but rather she saw Mousey on the ground after he had been shot.

During the trial, Karina was impeached with her preliminary hearing testimony, in which she stated she did not look at Dorsett and Mousey until she heard the first shot.

### 3.  *September 2005 Threats and Intimidation*

On September 14, 2005, Jasmine went to a motel room, where she joined Myra, Torres, Corrales, and a Muertos member named "Psycho."  Psycho asked Jasmine and Myra whether they had talked to the police.  He slapped both of them and threatened to kill Jasmine with a welding torch.  He displayed the lit torch to the group.  Psycho told the women that if he found out they had talked to the police, he would kill Jasmine's little sister, who was eight or nine years old at the time.

At Psycho's direction, Jasmine called Karina and invited her to the motel room.  When Karina arrived, Psycho made her sit on the bathroom sink and spread her legs, but she pushed him away and he stopped.  Psycho hit both Myra and Jasmine before letting Karina and Jasmine leave.  Afterward, Jasmine reported Psycho's threats to the police and her family was relocated.

### 4.  *Torres' Testimony*
#### a.  Trial testimony

Torres testified under a grant of immunity.  He conceded he had prior felony convictions for domestic violence, assault with a deadly weapon, and possession of firearms and ammunition.

6

On the day of the shooting, while Torres and a group of friends were hanging out in Dorsett's van, someone approached the van and some words were exchanged. As Torres began to leave, he heard the man ask, "Where you from?"

As Torres walked in search of a liquor store, he heard multiple popping noises. When he returned to the location where the van had been parked, he did not see the van or Dorsett.

b.     Torres' police interview

Officers interviewed Torres in September 2005. A recording of the interview was played for the jury. During the interview, Torres said that when he left to look for a liquor store, he heard one popping noise.

5.     *Additional Evidence*

a.     Police investigation

Officers learned that Abel Soto and Sergio Soto[5] brought Fujino to the hospital in a red Thunderbird around 9:30 p.m. Abel was an Evil Klan gang member and Sergio was a member of a tagging crew called Mexicans Kicking Ass.

Fujino died from a gunshot wound that pierced the edge of his left eye. A bullet recovered during the autopsy was most consistent with a .380 cartridge used in a semi-automatic gun with a three- to four-inch barrel. The medical examiner estimated the barrel was about 12 inches away from Fujino when the weapon was fired.

b.     Search of Dorsett's home

Dorsett was arrested on September 9, 2005. On September 13, 2005, police searched his home in Rancho Palos Verdes. They found a visa for Mexico in Dorsett's name in a bedroom closet and Dorsett's passport on a shelf in the bedroom.

_____

[5] The two Sotos were not related.

### c. Gang expert's testimony

Detective Michael Valento testified as a gang expert. He knew Jesse Fujino as a member of Evil Klan.

The area where the shooting took place was claimed by the Crazy Riders gang, while the Evil Klan claimed nearby streets. Detective Valento was not aware of any rivalry between the Evil Klan and the Muertos gang. In 2005, Evil Klan members were known to go outside their territory and shoot at other gang members. The same was true for the Muertos gang. Detective Valento acknowledged it was "a fair assumption" that a gang member going into unknown or rival territory would be armed.

## B. Defense Evidence

### 1. *Evidence of Multiple Shots Fired*

On the evening of June 17, 2005, several residents in the area of the shooting described hearing sounds similar to gunshots.

At around 10:00 p.m., Nicole Davis heard "more than one" sound—a series of "consecutive pop[s]" that sounded like gunshots. Chuckie Armstrong heard two shots, one after the other, that each sounded different from the other. He was certain the second sound was not an echo of the first shot. Monica Ruiz heard three "loud blasts." Jesus Escobar heard "two loud booms." Alyce Oliver heard three gunshots.

Dennis Hernandez, Myra's brother-in law, testified that he was at the apartment he shared with Myra when he heard four or five gunshots.[6] The shots were fired consecutively and sounded different from one another. When questioned on the night of the shooting, Dennis told the police that he heard more than one shot that night.

---

[6] At the time of the retrial, Dennis was in state custody following convictions for kidnapping and robbery.

8

Agustin Cortez testified he exchanged words with the man who urinated on the van, and then left to use the bathroom in Myra's apartment. While Cortez was inside, he heard multiple gunshots. Cortez also told police in September 2005 that he heard more than one shot.

2.  *Evidence of the Victim's Propensity for Violence*

On March 7, 2001, the police interviewed Jesse Fujino while investigating an assault. Fujino, who was 15 years old at the time, told officers that while he was on his way to a liquor store, he had an altercation with a rival gang member. The gang member threw a soda at Fujino's car, and another male threw a wrench at Fujino's car, shattering the windshield. Fujino and three fellow gang members returned to the location of the altercation. While Fujino acted as a lookout, two of his companions walked to the street. One shot was fired, and they ran back to the car and left.

The 2001 shooting took place eight or nine blocks from the location of the instant shooting in 2005.

3.  *Dorsett's Testimony*

Dorsett testified that in June 2005, he was 19 years old and lived in Perris. He was a member of the Muertos gang and occasionally hung out with other gang members when he was in Los Angeles. He carried a gun for his protection and safety.

On June 17, 2005, Dorsett borrowed his father's van. He put his loaded .380 semi-automatic gun under the back seat of the van. He picked up Corrales, Torres, Cortez, and Cortez's cousin and drove to Myra's apartment on 95th Street.

At 8:00 or 8:30 p.m., the group gathered inside Dorsett's van. At some point a man urinated between the van and a Thunderbird that was parked behind the van. About 10 to 20 minutes later, another man, who Dorsett later learned was Fujino, pulled open the sliding door of the van and aggressively screamed, "Where you

9

vatos from?" Dorsett understood the question to be a gang challenge. Fujino's actions suggested to Dorsett that he was armed.

After Fujino issued the gang challenge a second time, either Corrales or Cortez replied, "Muertos." Fujino walked away and stood next to the Thunderbird.

Dorsett stayed in the van. During an argument between Dorsett and Myra, Dorsett saw Myra's brother, Dennis, exit the apartment building and meet with Fujino and two men in front of Myra's apartment building. Myra told Dorsett that the men were Dennis' friends. Dorsett felt that eliminated any threat and that things had de-escalated. About 15 to 20 minutes later, Cortez left to use the bathroom and Dorsett ordered everyone else out of the van so he could go home.

Dorsett got out of the van last. He did not want to stay, but felt uncomfortable leaving Corrales with the others. As the others walked toward Myra's apartment, Dorsett took his gun out from under the seat before leaving the van.

As he started to walk toward Myra's apartment, Fujino and his two friends took a position "almost right in front of [his] path." Fujino said, "Hey sucka, do you know where you're at?" Dorsett put up his hands and replied, "Chill, I'm not from around here." Fujino responded, "I asked you if you know where the fuck you're at?"

Dorsett was scared. No one else was on the street; his friends had gone back to Myra's apartment. The two men with Fujino were flanking him, and he felt boxed in. When Dorsett said, "Ain't this Crazy Riders," Fujino ran up to Dorsett's face while the other two men "mad-dogg[ed]" Dorsett "in an aggressive posture." Fujino yelled that they were in Evil Klan territory and "Fuck Crazy Riders."

Fujino "reach[ed] to the back of his waistband" and pulled out a firearm. At the same time, Dorsett grabbed his gun from inside

his belt. Dorsett hit Fujino's gun hand with his left hand and fired his gun with his right hand. Fujino's gun fired as Dorsett knocked Fujino's hand. After Dorsett fired his gun, he quickly turned around, returned to the van, and left.

Three days later, Dorsett's father told him people had twice come to his house looking for him. Dorsett told his father that somebody had tried to kill him and he had shot the person. His father drove him to Mexico, where he stayed for about a month.

Dorsett was arrested on September 9, 2005.

4.      *Testimony of Defense Gang Expert*

Martin Flores testified as a gang expert for the defense. He explained that there is an expectation among gang members that if one member is involved in a confrontation, his fellow gang members will back him up. A small disrespect can make a gang member angry and cause him to respond. The challenge "Where you from" can be confrontational, but demanding "Do you know where the fuck you're at" is an even bolder challenge.

## C.      Jury Verdict

On January 11, 2018, following a second jury trial, Dorsett was convicted of second degree murder. The jury found that he used a firearm in the commission of the offense pursuant to Penal Code section 12022.53, subdivision (d).[7] The trial court sentenced him to state prison for an aggregate term of 40 years to life, consisting of 15 years to life for the second degree murder, plus 25 years to life for the gun use enhancement.

---

[7] All further statutory references are to the Penal Code unless otherwise indicated.

## DISCUSSION

Dorsett contends the trial judge committed prejudicial judicial misconduct by engaging in a pattern of conduct wherein he disparaged defense counsel and questioned witnesses in a manner that created a hostile atmosphere for the defense. Respondent counters that the majority of Dorsett's challenges are forfeited by his failure to raise a timely objection, that the trial judge properly exercised his discretion to control the courtroom proceedings and question witnesses, and that any error was harmless in light of the strength of the evidence. After reviewing the record, we conclude the trial court engaged in judicial misconduct that, when viewed in the aggregate, rendered the trial fundamentally unfair.

### A. Governing Legal Principles

"We review claims of judicial misconduct under the de novo standard and on the basis of the entire record." (*People v. Williams* (2021) 60 Cal.App.5th 191, 202; see also *People v. Peoples* (2016) 62 Cal.4th 718, 789.)

" ' "Although the trial court has both the [statutory] duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' . . . ." ' [Citation.]" (*People v. Nieves* (2021) 11 Cal.5th 404, 477 (*Nieves*); *People v. Sturm* (2006) 37 Cal.4th 1218, 1233 (*Sturm*).) This is because "[j]urors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials." (*Sturm, supra*, at p. 1233.) As such, their comments " ' "must be accurate, temperate, nonargumentative, and scrupulously fair." ' " (*Nieves, supra*, at p. 477, quoting *Sturm, supra*, at p. 1232.)

Nevertheless, " '[o]ur role . . . is not to determine whether . . . some comments would have been better left unsaid.' " (*People v. Snow* (2003) 30 Cal.4th 43, 78.)  Instead, " 'we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' [Citation.]" (*Ibid.*)  We make that determination on a case-by-case basis, examining the context of the court's comments and the circumstances under which they occurred.  (*People v. Cash* (2002) 28 Cal.4th 703, 730; *People v. Melton* (1988) 44 Cal.3d 713, 735.)

In his opening brief, Dorsett identifies numerous incidents in support of his judicial misconduct claim.  These incidents are set forth below, numbered sequentially and placed under two separate headings: (1) treatment of defense counsel; and (2) treatment of witnesses.  We address only those incidents that took place while the jury was present.[8]

## B.    Treatment of Defense Counsel

### 1.    *Factual Background*

The trial court directed many comments at defense counsel that were critical of counsel's trial skills and acumen.  We recount the most troubling comments in chronological order as they occurred at trial.  We note that "[n]ot every example amounts to misconduct independently, nor does each necessarily involve an

---

[8] While Dorsett also challenges a series of discussions that occurred outside the jury's presence, we omit them from our discussion as they could not have resulted in prejudice.  (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 319-325 [noting that because the challenged colloquies were not made in the presence of the jury, they could not have prejudiced the jury's view of the defendants]; see also *Nieves*, *supra*, 11 Cal.5th at pp. 495-497 [events that took place outside the presence of the jury could not form the basis for judicial misconduct].)

erroneous legal ruling.  But together they tend to illustrate the demeaning, patronizing attitude displayed by the judge toward [counsel] before the jury."  (*People v. Fatone* (1985) 165 Cal.App.3d 1164, 1176.)

## No. 1

While defense counsel was cross-examining Jasmine, the court admonished him, "Let's have straightforward questions, don't put arguments in there, or I will start sustaining my own objections."

## No. 2

When defense counsel asked Jasmine whether she called the police during the seven days after the shooting, the court stepped in and said, "We don't need this, [counsel].  We know . . . [t]he jury can count.  It's seven days. . . .  I don't know why you need to do this, 'seven days, and you didn't call,' and—it just wastes time. . . .  You have to stop doing it.  You're wasting time.  Trust the jury to understand your point, without making them three or four times."

## No. 3

When defense counsel posed a question to Jasmine that began with the phrase "we now have established," the court interrupted and admonished, "Don't say what 'we have established.'  I don't know who 'we' are.  'We' is an undefined term.  You shouldn't speak of 'we.' "  The court reiterated the point when counsel used the term "we" again, stating, "Do you want to take the word 'we' out of your question and ask it," and " 'We' don't know anything. . . .  I know a lot of things.  You know a lot of things.  Together we know nothing.  Please don't use that phrase."  When counsel later began a question with the phrase, "And we can assume," the court interrupted and said, "We can't assume . . . so we're . . . not going to talk about that."

No. 4

Defense counsel asked Jasmine whether she remembered being asked a question earlier in the trial. The court admonished counsel as follows: "So please don't ask, 'Do you remember what you were asked earlier today,' unless it's really important. . . . What I would like for you to do is ask straightforward questions. I mentioned outside the presence of the jury already that asking witnesses do they remember is a very weak form of questioning. I told you both that. I've heard it from both of you. So now in front of the jury I'm telling them that. 'Do you remember' is rarely the correct question. Just ask a fact: . . . It's not, 'Do you remember saying.' Try to avoid that, both of you."

No. 5

The court interrupted counsel to admonish him to stop asking Jasmine about testifying under oath: "So [counsel], when she testifies in court, she's under oath. You've said it about six times in the last two questions. The jury knows that. So she testified in June of 2006 under oath. She testified in 2007 in court under oath. I don't think the "under oath" needs to be repeated over and over. I think it becomes argumentative. I think the jury gets the point. Please leave it out of your questions, if you can."

The court again interrupted counsel when he sought to ask Jasmine whether Dorsett made any statements expressing an intention to harm anyone prior to exiting the van, stating, "[Counsel], we have covered this." Counsel responded that he did not think it had been covered, but he would move on. The court continued: "The time limit that I'm going to impose will be strict, especially if you keep repeating. Yes, this has been asked of both the Hermosillo sisters more than once."

15

## No. 6

While cross-examining Karina, defense counsel elicited testimony that she could hear Dorsett and Fujino screaming, but could not make out any of the words being said. She further testified her view of Fujino was blocked by Dorsett. Defense counsel asked, "So assume the other person is saying something violent or aggressive. You could not see his face to determine that; is that correct?" The court interjected: "[Counsel], why would you give a hypothetical like that? . . . If she can't hear anything, if he was singing Christmas carols, if he was making a threat, if he was stating the pledge of allegiance—if you can't hear, you can't hear. So don't try to load the question in that way, please. It's argumentative."

When defense counsel stated he wasn't trying to load the question, the court responded, "It's argumentative, and you know it is. Don't quarrel with me, please."

## No. 7

During cross-examination of Karina, defense counsel asked, "Isn't it true that you only saw Mr. Fujino after you heard a gunshot or gunshots and he was already on the ground? Is that correct?" The court noted the question was inconsistent with testimony that Karina had seen Fujino earlier in the evening, and stated, "So if that's what you are really asking here, she didn't see the man, didn't hear him, didn't see anyone until he was on the ground, I don't see how this advances the jurors' vast understanding of the case. So ask that hypothetical version of the facts."

After counsel read a portion of the preliminary hearing transcript and asked Karina if she had "testif[ied] like that," the court said, "So, [counsel], it's in the preliminary hearing transcript.

She's under oath.  'Did you testify like that' is not a complete waste of time, but is close to that."

After defense counsel read another preliminary hearing passage, he noted that the preliminary hearing was a year after the shooting and asked Karina if she "remember[ed] coming to court and testifying?"  The trial court commented that "[w]e don't need all the buildup," questioned the relevance of the query, and observed that "she's not denying testimony that has been read" and thus "we can safely conclude she did remember coming to court."

When counsel was cross-examining Karina about her prior testimony, the court interrupted and told the jury:  "Ladies and gentlemen, if that sounds familiar, that was read to you already.  So you now have a transcript reading a transcript.  And if somebody were to appeal this case, they would have a transcript of a transcript of a transcript.  I'm going to ask the lawyers not to do that, not to reread things that have been included in other passages.  That is not helpful.  Are we finished with this witness?"

## No. 8

During defense counsel's cross-examination of an officer who responded to the scene, the prosecutor objected to counsel reading a statement from a document ("four shots heard, nothing seen") on hearsay grounds.  The court agreed and stated, "Yes.  Disregard that, ladies and gentlemen.  It's not an appropriate use of this document."

At another point, counsel asked the officer if it was "not uncommon for gang members to take weapons from a crime scene."  After the court sustained the prosecutor's objection, the court criticized counsel for trying to argue his case through his questioning:  "And now you've confirmed for me that you're arguing, in your question—it's an argumentative phrasing of the question.  At the end of the case, of course, you'll be able to argue what the

17

evidence has shown, but you shouldn't be presenting your argument early to witnesses and having them adopt it."

No. 9

During cross-examination of Detective Valento, defense counsel asked, "Clearly, based on the police reports, at least five to six different people said they heard multiple gunshots?" Following the prosecutor's hearsay objection, the court admonished counsel: "All right. That's improper. Ladies and gentlemen, that's the kind of question a lawyer shouldn't ask. He's trying to get something out of a report into a question, before there could be an objection, before the witness can answer. [Counsel], you know better. Don't do that again."

After counsel denied this was his intent, and in front of the jury, the court responded, "I don't care if it was your intent. You did it. Don't do it again. You'll be found in contempt of court if you do something like that again. Next question please." When counsel asked to approach the bench, the court refused, stating, "No, you may not approach. When you ask a question, you shouldn't include something that you know will be objectionable. That's been a contested issue throughout this trial. It's not a surprise. You're not fooling me. Now go ahead with the next question."

Within a page of transcript, while the jury was still present, defense counsel asked again to approach. The court again refused: "Continue with your questioning. If I hear an objection, I will rule on it. If I think you're crossing a line, I will stop you myself. Go ahead." The court subsequently commented, "The trial, as you've probably noticed, is taking longer than it should. So if we spend half of our life at the sidebar, it will be in February before [we] finish this case. So, yes, there are purposes for sidebar, but it's not to pretest questions or to explain things. I'll rule on these as they come up."

During cross-examination of Detective Valento, defense counsel confirmed that Jasmine identified Abel Soto, through a photograph, as the person who urinated behind the van. After counsel asked the detective where he obtained the photograph, the court asked, "[Counsel], why would that be relevant?" After counsel responded that he "just want[ed] to know the time period," the court said, "That you just want to know is fascinating to me, but it's not relevant. What I want to know is not relevant either. What the jury needs to know is what's relevant. What they don't need to know is not relevant. So where he got the picture, at least right now, doesn't seem to be relevant."

When defense counsel subsequently asked the detective whether one gang member will "help and assist" another gang member, the court interjected, "Do you want to give us a little focus? Is that putting up Christmas lights? Is it committing a crime? Is it helping them after they're hurt? What do you mean . . . 'help and assist?' "

No. 11:  Defense Counsel's Objection and Mistrial Motion

After the last few exchanges, the court recessed for the day and outside the jury's presence, stated the following: "Now, [defense counsel], I got the sense at sidebar that you wanted to explain something to me about how you tried to run that question by, about all the people that told the police about all the shots they heard and whether there is something about it in a report. So something existing in a report does not make it admissible."

After further discussion on the point, the court warned defense counsel: "I'm telling you that, if you do something like that again, take something that, in my view, is clearly hearsay, load it into a question in hopes that the jury hears about it, then I will fine

you for it. I will find you in contempt and fine you money for it. I don't know another way to stop it. I'd rather do that than admonish you in front of the jury, but I'll do that, too, if this continues to happen."

Counsel objected that the court already had admonished him in front of the jury instead of waiting for a break in the trial. Counsel expressed concern about the prejudicial spill-over effect on Dorsett from the court's treatment of him.

The court rejected counsel's characterization and threatened to sanction him if he found counsel "running hearsay into your questions like that." The next morning counsel moved for a mistrial. The court denied the motion.

## No. 12

During his re-direct examination of the defense gang expert, defense counsel asked, "Based on the information that was provided to you and questioning by both lawyers, is it reasonable to believe that Mr. Fujino, the person who was shot, was probably armed . . . [?]" The prosecutor objected, and the trial court stated, "You do not ask that. Please do not ask that again. I've told you it's not an appropriate question." When defense counsel responded, "This is your jury instruction, I thought. Maybe I'm wrong," the court said, "You're wrong. All right? I will instruct the jury at the end of the case, and their decision will be whether there's any such evidence. This is not for [the witness] to comment on."

## No. 13

In examining a gang investigator about Fujino's involvement in the 2001 shooting, defense counsel asked, "Did you ever tell—or if the right word's 'challenge' Mr. Fujino, when you were speaking to him outside, that you had information that --." The trial court interjected, "I think the information he had is likely hearsay. I

think to pose it in a question could be very problematic." Defense counsel stated he would rephrase the question and asked, "Did you tell or ask Mr. Fujino that he was the shooter of this particular incident?" The prosecutor objected on hearsay grounds, and the trial court asked, "So [defense counsel], do you have reason to believe the detective, who wasn't there to see it, would have told Mr. Fujino that he was the shooter?" Counsel responded that "[t]he detective's report says that." The prosecutor objected again, and the court told the jury, "Ladies and gentlemen, this is not an appropriate way to introduce evidence before a jury." After counsel protested that he was simply answering the court's question, the court responded, "[A]re you really having trouble understanding this hearsay issue . . . again? Because really what's in the report should not be in your questions. And I'll look at the report and find out what has caused you to ask this question." After the court reviewed the pertinent part of the report, the court said, "This is not admissible evidence that you're alluding to."

2. *The Trial Court Engaged In Judicial Misconduct By Disparaging Defense Counsel*

As an initial matter, we address respondent's contention that Dorsett forfeited his claims of judicial misconduct by failing to make an appropriate objection following each challenged incident. As a general rule, judicial misconduct claims are not preserved for appellate review if no objections thereto were made at trial, unless an objection would have been futile or an admonition could not have cured any prejudice caused by such misconduct. (*Sturm*, *supra*, 37 Cal.4th at p. 1237.)

Dorsett's counsel objected to the trial court's comments and moved for a mistrial based on the court's treatment of counsel in front of the jury. In addition, as we discuss below, counsel moved a second time for a mistrial based on the manner in which the court

questioned a defense witness (see Discussion, section C,1, No. 16, *post*).  In light of the number of times the court rebuked counsel, and the discord between the court and counsel, it would be " 'unfair to require defense counsel to choose between repeatedly provoking the trial judge . . . or, alternatively, giving up his client's ability to argue misconduct on appeal.' " (*Nieves, supra*, 11 Cal.5th at p. 482, fn. 12; *Sturm, supra*, 37 Cal.4th at p. 1237.)  As such we find no forfeiture here.

We next conclude the trial court's persistent and discourteous commentary constituted misconduct.  (*Nieves, supra*, 11 Cal.4th at pp. 477-478; *Sturm, supra*, 37 Cal.4th at pp. 1238 & 1240.)  As noted by our high court, " 'It is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial,' " because " 'it is not the lawyer who pays the price, but the client.' " (*Sturm, supra*, at p. 1240, quoting *People v. Fatone, supra*, 165 Cal.App.3d at pp. 1174-1175.)  "This principle holds true in instances involving a trial judge's negative reaction to a particular question asked by defense counsel regardless of whether the judge's ruling . . . was correct . . . ." (*Sturm, supra*, at p. 1240; see *Nieves, supra*, 11 Cal.5th at p. 484 [reiterating same]; see also *People v. Black* (1957) 150 Cal.App.2d 494, 499 ["though counsel's line of inquiry was objectionable, and the evidentiary ruling essentially proper, the judge's remarks accusing counsel of unfairness constituted misconduct"].)

Here, the trial judge made numerous comments in front of the jury that (a) disparaged counsel and demeaned his trial skills (Nos. 1, 2, 3, 4, 6, 10), (b) portrayed him as wasting the jury's time (Nos. 2, 5, 7, 9), (c) insinuated he was deliberately misleading the jury by asking improper questions (Nos. 6, 8, 9, 12, 13), and (d) accused him of engaging in unlawful conduct that could subject

him to contempt proceedings (No. 9).  As in *Nieves*, the trial court's "stern remarks and periodic sarcasm . . . impugned counsel's competence and 'inevitably conveyed to the jury the message that the trial court thought that defense counsel was wasting . . . time by asking inappropriate questions.'  [Citation.]" (*Nieves, supra*, 11 Cal.5th at p. 483.)  In particular, "[t]he trial court's comments implying that defense counsel was behaving unethically or in an underhanded fashion constitute[s] misconduct." (*Sturm, supra*, 37 Cal.4th at pp. 1240-1241.)

In *Sturm*, the California Supreme Court concluded the trial court's numerous "sua sponte interruptions tended to be negative and disparaging." (*Sturm, supra*, 37 Cal.4th at p. 1241, fn. 3.)  A few of the examples the court cited as reflective of this pattern are as follows:

- " 'Come on . . . [defense counsel], please.  I don't like to interrupt.  You know, there is no way you can get that in.  You've been around enough and I don't want to chastise you in front of the jury but we have just gone through, you want to relate what her sons thought . . . .  And we are here and holding the jury over late . . . .  And clearly you know these questions are objectionable.  Why ask them?' " (*Sturm, supra*, 37 Cal.4th at pp. 1234-1235.)
- " '[Y]ou are not grasping my ruling, I don't believe.  I can tell this is going nowhere.' " (*Sturm, supra*, 37 Cal.4th at p. 1235.)
- " 'No, no, no.  We are back to the same question number one again.  I rule, I rule and then you go back and ask the question just a little bit different, *trying to sneak it by*.  Is that the particular word I should use?  Again, [defense counsel], please . . . .  So again, admonish the jury that [defense counsel's] questions are not evidence, *as much as he would*

*like them to be evidence.*"  (*Sturm*, *supra*, 37 Cal.4th at p. 1235.)

In *Nieves*, the objectionable remarks referenced by our high court included the following:

- " 'Why don't you just ask a simple question?'  '[D]on't talk, except to ask a question'; 'You don't listen do you?'; 'Stop saying "ah" every time you get an answer'; 'Don't say "okay" anymore'; 'Just ask the question in a proper way'; and 'What does it take to get the point that you can't talk at the same time [as the witness]?' "  (*Nieves*, *supra*, 11 Cal.5th at p. 479.)

- " '[Y]ou are using valuable court time for something that doesn't need to be used'; responding to counsel's question about an exhibit number by stating, 'Look at the tag on the front; it might give you clue'; responding to counsel's question that began 'I appreciate the fact that . . .' with, '[w]hat your appreciation level is, is not pertinent or helpful'; . . . [and] characterizing counsel's [question as a] 'ridiculous question' . . . appropriate only for 'comic books or the movies.' "  (*Nieves*, *supra*, 11 Cal.5th at p. 479.)

The trial judge's comments during Dorsett's trial are remarkably similar in both substance and tone to those cited in *Sturm* and *Nieves*.  This repeated and improper disparagement of defense counsel discredited the defense and constitutes judicial misconduct.  (*Nieves*, *supra*, 11 Cal.5th at p. 477; *Sturm*, *supra*, 37 Cal.4th at p. 1240.)

In addition, the unequal treatment of counsel can be indicative of judicial misconduct.  (*Sturm*, *supra*, 37 Cal.4th at p. 1241 [observing that "[t]he trial judge's negative remarks about defense counsel are also troubling in light of the unequal treatment by the court of the prosecutor and defense counsel," which "created the impression that the trial judge was allied with the

prosecution"].)  We agree with Dorsett's assessment that "while the court did admonish the prosecutor on occasion, those admonishments were brief and mild, unlike the court's repeated, and often sarcastic, admonishments to [defense] counsel."[9]

Respondent does not dispute Dorsett's assessment of the court's unequal treatment and instead argues that each challenged instance is a reflection of the trial court's right to control the courtroom proceedings.  We disagree.  The comments "were not 'relatively brief and mild' references" or mere "showings of 'occasional impatience,' " "but 'persistent, discourteous, and improper remarks that amounted to misconduct.' "  (*Nieves, supra*, 11 Cal.5th at p. 485; *Sturm, supra*, 37 Cal.4th at pp. 1233, 1238, 1241; see also *People v. Fatone, supra*, 165 Cal.App.3d at p. 1176 [examining the trial judge's comments for their cumulative effect].)

## C.    Treatment of Witnesses

Dorsett contends the trial court committed misconduct by frequently interrupting the proceedings to ask questions or make comments that "highlighted testimony that helped the prosecutor or harmed the defense."  Dorsett identifies numerous examples as supportive of his claim.  We reference only the most problematic colloquies below.

---

[9] Our reading of the record reflects that the court's remarks to the prosecutor were generally mild—and more likely to follow an objection by defense counsel rather than a sua sponte interruption by the court.

1.    *Factual Background*

## No. 14

When the prosecutor asked Torres whether he wanted to testify, defense counsel objected, "Asked and answered."  The court stated:

"The Court:  Many of us don't want to be here, we'd rather be other places, so that's not the issue.  Is this something you would rather not do?  Even if the date was convenient, et cetera, testifying in this case is something that you would rather not do if you had a choice?

"The Witness:  Would rather be—I would rather be elsewhere.

"The Court:  And you'd rather not testify—you don't have a choice, by the way, but if you had a choice, you would say, 'I don't want to testify.'  Is that right?

"The Witness:  Right.

"The Court:  Go ahead."

## No. 15

The defense called Lorena Fernandez, a Muertos gang member, in an effort to impeach the credibility of Jasmine and Karina by inferring they were friendly with Fujino and therefore were biased.  At one point, Fernandez testified that prior to June 2005, she had seen Fujino once at Myra's apartment while Karina and Jasmine were present.  She had no recollection of the time-frame of this occurrence.

During cross-examination, the following exchange ensued:

"[The Prosecutor]:  What does Mr. Fujino look like?

"[The Witness]:  He's Hispanic.  Tattoos.

"[The Prosecutor]:  Where are his tattoos?

"[The Witness]:  He had a lot.

"[The Prosecutor]:  He had a lot of tattoos?

"[The Witness]:  Yes.

"[The Prosecutor]:  Really?  Describe them to me.

"[Defense Counsel]:  Objection to the 'really.'

"[The Court]:  No editorial comment.  She wants you to describe a lot of tattoos that you saw.

"[The Witness]:  I don't—

"[The Court]:  So give a location, to start.  Any on the face?

"[The Witness]:  I don't recall.

"[The Court]:  Arms?

"[The Witness]:  I don't remember his tattoos.  Sorry.

"[The Court]:  Legs?

"[The Witness]:  I don't remember his tattoos.

"[The Court]:  Shoulders?

"[The Witness]:  I don't remember.

"[The Court]:  Chest?

"[The Witness]:  I don't remember the tattoos.

"[The Court]:  Back?  *Did you kind of make that answer up about the tattoos*?

"[The Witness]:  No.

"[The Court]:  You saw them?

"[The Witness]:  Yeah, but I don't remember what they were of.

"[The Court]:  Not what they were of, just where they were.  Just think for a moment, picture this man you remember, and tell us where you remember seeing the tattoos.

"[The Witness]:  I'm sorry.  I don't remember.

"[The Court]:  You're still sure that you saw some?

"[The Witness]:  Yes.

"[The Court]:  And if he didn't have any tattoos, are you remembering a different person then?

"[The Witness]:  No.

27

"[The Court]:  I'm not sure if you're more sure of the tattoos or the man.

"[The Witness]:  Yeah, I don't remember his tattoos, exactly where they were.

"[The Court]:  Was this outside at a table or was it inside the apartment?

"[The Witness]:  Outside in the back apartment.

"[The Court]:  So back of the apartment at a table?

"[The Witness]:  Yes.

"[The Court]:  A man with tattoos that you know was Mr. Fujino?

"[The Witness]:  There was multiple men there and—

"[The Court]:  Did they all have tattoos?

"[The Witness]:  Some of them did.

"[The Court]:  And the one that you think is Mr. Fujino, you're sure that he had tattoos?

"[The Witness]:  I believe so, yes.

"[The Court]:  So just describe one for us.

"[The Witness]:  I don't remember any tattoos.  I'm sorry.  I'm sorry.  I don't remember the tattoos.

"[The Court]:  You're so sorry?

"[The Witness]:  Yeah.  I don't remember."[10]  (Italics added.)

No. 16:  Motion for Mistrial

After Fernandez completed her testimony, defense counsel stated that "some of the court's comments with Ms. Fernandez in front of the jury were inappropriate."  The court asked for an example, and counsel noted the court had suggested the witness

_____

[10] According to the medical examiner, Fujino had one tattoo on the back of his upper right arm.

was not credible.  The court stated credibility was a matter for the jury, and that if counsel wanted to point out a specific statement the court made, and the court agreed it was a problem, it would instruct the jury to disregard it.

The next day, defense counsel read the court excerpts from its questioning of Fernandez, including the court's query as to whether Fernandez "just kind of ma[d]e that answer up about the tattoos." The court responded, "That was a question, not a statement to the jury," and remarked, "[i]t seems that the defense would prefer a free-for-all, maybe a mistrial, maybe to build in [ineffective assistance of counsel]."  Defense counsel asserted that an admonition would not cure the prejudice created by the impression that Fernandez was not telling the truth, and requested a mistrial. The court denied the motion stating, "I will tell [the jury] not to consider any opinion of mine as indicative of what I think about the case or what the verdict should be.  But it's hard for me to sit by and wonder whether someone is suborning perjury and ask no questions."

No. 17

On cross-examination, the prosecutor asked defense gang expert, Martin Flores, "[J]ust because someone says, 'where you from[ ]' doesn't always mean it's a challenge[,] is that correct?"  The expert responded that "these are not just . . . yes-or-no answers." The court stepped in and the following exchange ensued:

"The Court:  Mr. Flores, I think that one's a 'Yes' or 'No.' She's saying it's not necessarily a challenge. . . .  'Necessarily' would mean every single time it's a challenge.  If it's not a challenge two times out of ten, five times out of ten, nine times out of ten, then it's not necessarily a challenge.  So you can handle that with a 'yes' or 'no.'

"The Witness:  Your Honor, respectfully, I would say—

29

"The Court:  So 'respectfully' is what lawyers usually say before they say something that I don't like.  I'm going to encourage you not to do that.  *Now, when the jury is instructed at the end of the case, they'll be told that witnesses who answer directly get a certain level of credibility.  People who don't get less[, a]nd I would hate to see you, in the process of trying to be too fine with your answers, appear to be avoiding things.*  So wouldn't you agree that it doesn't necessarily have to be a challenge, when you walk up and say, 'Where you from?'

"The Witness:  I would agree, if an everyday person asked that question, then, sure, it doesn't necessarily mean a challenge.

"The Court:  Many times it is, but not every time?

"The Witness:  For a non-gang member to ask that question, sure, it's not necessarily a challenge.

"The Court:  Well, even for a gang member who walked up and asked that, it isn't necessarily a challenge, is it?  What if I'm in such a big gang that I don't even know if you're in my gang, and I'm just asking—

"The Witness:  That's correct, your honor.

"The Court:  —And I'm just asking.  And you'll say the same gang that I'm in, and I'll say 'Great.  Do you know so-and-so?' Suddenly we're close friends, that's not necessarily a challenge.

"The Witness:  That is correct, your honor. That is a good example where that is correct.

"The Court:  And sadly enough, there are some gangs that are so big and successful that they don't even know their fellow members.  True?

"The Witness:  That is correct.

"The Court:  Go ahead, please."  (Italics added.)

30

No. 18

As discussed above, defense counsel asked the gang investigator whether he asked or told Fujino that he was suspected of being the shooter in the 2001 incident. The court indicated the question sought to elicit hearsay, and asked to review the police report that supported the inference that the detective identified Fujino as the shooter. The court then asked the following questions:

"The Court: So, detective, do you sometimes give people information that exaggerates what you know, hoping that they will then admit to it because it's true?

"The Witness: Yes, sir.

"The Court: So if you went to your car—I assume you drove a car here today—and found that your radio had been stolen and you suspected I had stolen it, you might say, even though it wasn't true, 'we have information that you're the person that stole this from the car,' hoping that I would say, 'All right. You got me. I'm the one who took it.' That's an acceptable tactic[,] correct?

"The Witness: Correct.

"The Court: Even if what you're telling me is not true, that you don't have the information?

"The Witness: Correct, yes.

"The Court: So you would then write that report in your report by saying 'I told the suspect we had information?'

"The Witness: I would.

"The Court: All Right. And that's what we're looking at here, isn't it?

"The Witness. Yes, sir.

"The Court: It's a bluff[,] right?

"The Witness. A ruse, yes.

"The Court: A ruse or a bluff. Go ahead [defense counsel]. . . .

31

"[Defense counsel]: Based on that topic, is that what occurred on the day and time in question that you spoke to Mr. Fujino, that in order to get him to speak with you, you did this bluff?

"[The Witness]: Yes.

"[Defense counsel]: And you recall that specifically?

"[The witness]: I do.

"[Defense counsel]: Is there any notes that say that, the reason why you asked that question? In other words, why this was a bluff, in other words?

"[The witness]: No."

After the parties completed their questioning of the officer, the court asked the following questions:

"The Court: Detective, I just want to clarify: What Mr. Fujino admitted to was driving somewhere, claiming some provocation, and bringing some other people? He admitted that?

"The Witness: Yes.

"The Court: He did not admit shooting?

"The Witness: He did not.

"The Court: He said he had a different role?

"The Witness: Yes.

"The Court: And that someone else did the shooting?

"The Witness: Correct.

"The Court: And as far your knowledge, he could have been the person who fired, or possibly not, but you went on what he told you and put that in your report?

"The Witness: That's correct."

### No. 19

On cross-examination, Dorsett testified that as he hit Fujino's hand, the gun fired and Fujino's hand moved upwards. The court subsequently interjected: "And I don't know if it will help you communicate to talk about where the gun frame went versus where

the barrel was pointed versus where the bullet went since the gun can go up, but the bullet doesn't necessarily go up because the gun goes up." After the trial court's comment, the prosecution pursued a different line of inquiry.

No. 20

During cross-examination, the prosecutor asked Dorsett about his September 2005 police interview in which he told police that he had just returned from Mexico.[11] The prosecutor asked Dorsett why he said he had been out of the country when the detective wanted to talk to him about a shooting. Dorsett responded that his father told him to go to Mexico for his own safety after people showed up at his house looking for him. The court interjected:

"The Court: . . . [W]e're back to the conversation with the detective. So you decided, when the detective presented to you the situation, to mention Mexico. And was that the choice of the first thing to say?

"The Defendant: Understood. So he suggested that I go to Mexico, Puerto Vallarta specifically. He said, 'If you get arrested, you know, not to'—pretty much not to speak, to deny everything and ask for a lawyer. . . .

"The Court: Mr. Dorsett, I think we wandered a bit. Have you said what you wanted to say about your statement to the detective about Mexico?

"The Defendant: Yeah. My—they told me—

"The Court: Have you said what—the context you wanted to give to that?

---

[11] The record reflects that Dorsett invoked his right to counsel at the outset of the interview. Later he asked the officer "what's going on?" adding, "I haven't even been in this fucking country, dude. . . . I barely got back."

33

"The [Defendant]: My family told me not to—

"The Court: 'Yes, I have said it,' or 'No, I feel I need more explanation[?]'

"The Defendant: A little more explanation, if possible.

"The Court: Does it relate to your thinking?

"The Defendant: Yes. The reason why—

"The Court: Some people might be curious why didn't you just tell the detective, 'someone tried to kill me, and I killed him instead.'

"The Defendant: Because my family told me not to speak to law enforcement, to ask for a lawyer as soon as I was arrested. Not to run. Just as soon as I was apprehended to ask for a lawyer. And they had already one on standby.

"The Court: So your goal was to do what had been recommended to you?

"The Defendant: Yes.

"The Court: Go ahead, please."

21.

In rebuttal, the prosecutor recalled the gang expert to testify about various gang-related writings found in Dorsett's bedroom. The detective explained some of the slang used in the writings, and stated that the words "cuete" and "heat" are slang terms for a firearm.

After both sides had completed their examination, the court asked the following:

"The Court: Detective, in these papers, have you noticed the term 'strap' is used?

"The Witness: Yes.

"The Court: So not just limited to gang culture, that term has a specific slang meaning of which you're aware[,] is that correct?

"The Witness:  Correct.

"The Court:  And if I were to say in that context, 'I'm strapped,' what does that mean to you?

"The Witness:  That you're in possession of a firearm.

"The Court:  If I tell you to bring strap, what am I asking you to do?

"The Witness:  To bring a handgun.

"The Court:  Any further questions, in light of what I've asked, counsel?

"[The Prosecutor]:  No.  Thank you, your honor.

"[Defense counsel]:  Not by the defense."

2.     *The Trial Court Engaged in Judicial Misconduct by Directing Improper Comments and Questions to Defense Witnesses*

For the reasons stated above, we find no forfeiture of Dorsett's claims involving the court's examination of witnesses.  (See Discussion, section B,2, *ante*.)  Indeed, the trial court's wholesale dismissal of defense counsel's concerns regarding the court's examination of Lorena Fernandez serves to reinforce our conclusion that any further attempt by counsel to object to the court's involvement would have been futile.  (*Sturm, supra*, 37 Cal.4th at p. 1237; see *People v. Gomez* (2018) 6 Cal.5th 243, 292 [given the trial court's comments, it was reasonable to conclude that any objection concerning judicial bias would have been futile].)

In our view, the trial court stepped outside the boundaries of what can be characterized as proper witness examination.  As explained by our high court:  " 'The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator.  The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair" ' " and " ' "[t]he trial court may not . . . withdraw

35

material evidence from the jury's consideration . . . or otherwise usurp the jury's ultimate factfinding power." [Citation.]' [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 350; *People v. Rodriguez* (1986) 42 Cal.3d 730, 766.)

The record reveals the trial court intervened "in a significantly uneven fashion," thereby "strengthen[ing] the impression that the trial judge was allied with the prosecution." (*Sturm*, *supra*, 37 Cal.4th at p. 1242.) The trial judge zealously challenged defense witnesses with leading, and sometimes argumentative, questions (e.g., Nos. 15, 17). The court questioned prosecution witnesses in a manner that assisted the prosecution, essentially stepping into the role of the prosecutor to establish a point that supported the prosecution's case or called into question the credibility of the witness (e.g., Nos. 14, 15, 17, 18, 19, 20, 21). Such uneven treatment can in and of itself constitute misconduct by conveying an impression of partisan advocacy. (*Ibid.*; *People v. Rigney* (1961) 55 Cal.2d 236, 241 [noting that the trial judge "must not become an advocate for either party"].)

We address several instances in which the court's questions and comments created a danger of unduly influencing the jury by suggesting the court's view of the credibility of the witnesses and the weight of their testimony.

First, after a series of questions in which the trial court attempted to extract specific answers from Fernandez about the tattoos she observed on Fujino (No. 15), the court queried, "Did you kind of make that answer up about the tattoos?" This was unequivocally misconduct. (*People v. Rigney*, *supra*, 55 Cal.2d at pp. 241 [stating that the trial court "may not ask questions to convey to the jury his opinion of the credibility of a witness"]; see also *People v. Byrd* (1948) 88 Cal.App.2d 188, 191 ["Our courts have many times reversed convictions in criminal cases because of

intimations by the trial judge during the taking of testimony that the defendant or his witnesses was not believed by the judge"].)

The trial judge's comments directed at defense expert Martin Flores (No. 17) not only assisted the prosecutor by facilitating a line of questioning, they also conveyed a negative impression of the witness by criticizing his response to the prosecutor's question in a condescending manner. (*People v. Rigney*, *supra*, 55 Cal.2d at p. 241 ["A trial judge may examine witnesses to elicit or clarify testimony" but must not "under the [guise] of examining witnesses . . . cast aspersions or ridicule on a witness"].) The court went even further, suggesting that if Flores was "too fine" with his answers, the jury could find his testimony to be less credible. (See *Sturm*, *supra*, 37 Cal.4th at p. 1240 [noting "[t]he trial judge's behavior towards . . . expert witnesses for the defense conveyed to the jury disdain for the witnesses and their testimony and therefore constituted misconduct"].)

We are particularly troubled by the court's inquiry into Dorsett's failure to tell the police that he shot Fujino in self-defense (No. 20), because it strongly inferred the court did not view Dorsett's testimony to be credible, and undermined the defense theory of self defense. The court's use of the introductory phrase, "Some people might be curious," underscored a tone of skepticism or disbelief. When a court's questions convey the judge's opinion of the credibility of a witness, "there is grave danger not only that they may induce the jury to form an opinion before the case is finally submitted to them, but that the jury will substitute the judge's opinion for their own." (*People v. Rigney*, *supra*, 55 Cal.2d at p. 241; see also *People v. Williams* (2021) 60 Cal.App.5th 191, 203 ([" 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant' "]; *People v. Byrd*, *supra*, 88 Cal.App.2d at p. 191 [finding prejudicial misconduct

where the trial court asked a question from which the jury could infer the judge was questioning the truth of the defendant's denial of the commission of the crime].)

Finally, we express our concern with the questions posed by the court at the end of the prosecution's rebuttal case (No. 21). After the prosecutor had posed all of her questions regarding the gang-related writings found in Dorsett's home, moved on to other topics, and defense counsel had completed his cross-examination, the trial court stepped in to ask about Dorsett's use of the word "strapped" in his writings. In so doing, he was able to elicit testimony regarding both the possession and carrying of firearms. The court's four-part inquiry was the last testimony elicited before the parties rested.

Given that the date of the writings was unknown, and there was no indication that any of the writings had any connection to the shooting of Fujino, the trial court's emphasis on this tangential material was both unnecessary and highly damaging to the defense. The timing also ran the risk of conveying the impression that the trial court was putting a final judicial stamp of approval on the prosecution's case. (*People v. Black* (1957) 150 Cal.App.2d 494, 499.) By belaboring points of evidence that clearly were adverse to the defense, the trial court took on the role of prosecutor rather than that of an impartial judge. (*People v. Rigney, supra,* 55 Cal.2d at p. 241 [noting that a trial court "must not become an advocate for either party or under the [guise] of examining witnesses comment on the evidence"].)

## D.    Prejudice

The *Sturm* court did not determine whether judicial misconduct is evaluated for harmless error under *People v. Watson* (1956) 46 Cal.2d 818 or *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824,17 L.Ed.2d 705]. Instead, the court held that reversal

was required under either standard.  (*Sturm*, *supra*, 37 Cal.4th at p. 1244.)  Similarly, we conclude that reversal is required under either standard of review.

In evaluating prejudice, we are mindful that Dorsett's first trial resulted in his acquittal of first degree murder; we reversed the gang enhancement on direct appeal, and a federal court found an error sufficiently prejudicial to warrant a new trial.  While Dorsett does not claim the evidence is insufficient to support his second degree murder conviction, the verdict "was by no means a foregone conclusion."  (*Sturm*, *supra*, 37 Cal.4th at p. 1244; *People v. Grimes* (2016) 1 Cal.5th 698, 723.)  On this point, we find *People v. Robinson* (1960) 179 Cal.App.2d 624, particularly instructive.

In *Robinson*, the appellate court determined the trial court had committed prejudicial judicial misconduct by unnecessarily participating in the examination and cross-examination of witnesses, and taking it upon itself to develop testimony helpful to the prosecution.  (*People v. Robinson*, *supra*, 179 Cal.App.2d at p. 633.)  While the evidence was "manifestly" sufficient to justify the verdict, "it was not so strong or conclusive as to have precluded a reasonable doubt in the minds of the jurors as to [the] defendant's guilt."  (*Id*. at p. 636.)  The court noted that the case essentially "required appraisal of the credibility of the witnesses," and concluded that the trial court's misconduct tipped the scales in favor of the prosecution.  (*Id*. at p. 637.)

In the present case, the credibility of the eyewitnesses was crucial.  There was no dispute that Dorsett shot Fujino.  The key issue for the jury's consideration was whether he acted with malice aforethought or in the heat of passion by initiating an attack on Fujino, or whether he acted in self-defense in response to a threat of danger initiated by Fujino.  Resolution of these issues hinged on the

jury's assessment of the relative credibility of the prosecution and defense witnesses.

Dorsett's theory of self defense rested on his testimony that Fujino initiated an angry confrontation and he fired at Fujino in self defense after Fujino pointed a gun at him. The testimony by the eyewitnesses revealed that a confrontation ensued between Dorsett and Fujino after Fujino or one of his associates urinated on or near Dorsett's van and challenged Dorsett's group by questioning their gang membership. The prosecution's gang expert confirmed that Fujino was an Evil Klan gang member, and the location of the shooting was in an area claimed by a rival gang. According to the expert, it was common for gang members to arm themselves while in rival territory. Furthermore, Fujino had participated in a previous retaliatory shooting following an altercation with a rival gang member.

Five neighborhood residents who were unassociated with the defense (Davis, Armstrong, Ruiz, Escobar, and Oliver) heard multiple gunshots. Armstrong, who was familiar with firearms, testified the gunshots sounded different from one another, and the sound was not the result of an echo. Their testimony lent credence to Dorsett's claim that he fired in response to Fujino's brandishing of a weapon. (See *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263 [noting that if the jury believed the witnesses heard a pause between the first shot and subsequent shots, it could find the appellant had an actual belief in imminent peril and lethal force was necessary to defend against the shooter].)

Conversely, the prosecution witnesses either testified that they did not see or hear the entire exchange between Dorsett and Fujino, or they provided inconsistent statements on the issue. In particular, Jasmine provided the following variations of the shooting: (1) she saw Dorsett shoot Fujino; (2) she saw Dorsett point

a gun at Fujino before she ran but she did not see the actual shooting; and (3) she ran away and did not see the gun in Dorsett's hand until she turned around after hearing a gunshot. Similarly, during her police interview and at the preliminary hearing, Karina claimed she did not see Dorsett shoot Fujino, but at trial she testified she saw Dorsett shoot Fujino.

Due to the credibility determinations at play, the jury's verdict "was by no means a foregone conclusion." (*Sturm, supra*, 37 Cal.4th at p. 1244.) Dorsett presented plausible evidence, which, if credited, supported the defense theory. Given the relative weight of the prosecution and defense evidence, we cannot conclude that the trial court's disparagement of defense counsel and witnesses, and unnecessary intrusion into the adversarial process in a manner that appeared to favor the prosecution, was harmless. (*People v. Robinson, supra*, 179 Cal.App.2d at pp. 636-637; see also *Nieves, supra*, 11 Cal.5th at pp. 506-507 [finding " 'a "reasonable (i.e., realistic) possibility" ' [citation] that the outcome would have been different without the weight of judicial authority favoring the prosecution"].)

Nor do we find the trial court's instruction pursuant to CALCRIM No. 3550 sufficient to dispel any prejudice.[12] While we

---

[12] Pursuant to CALCRIM No. 3550, the jury was instructed: "It is not my role to tell you what your verdict should be. Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

Prior to reading the above passage from CALCRIM No. 3550, the court told the jury "[t]he next paragraph . . . I'm going to expand on a little bit first," and then stated: "I do not go into the jury room. You're probably thinking no kidding, judge, we know that. That's our job. So I don't go in there. Physically I will not be in there when you're in there. Mentally I don't want to be in there either

generally presume the jury followed its instructions (*People v. Harris*, *supra*, 37 Cal.4th at p. 350), the language in CALCRIM No. 3550 would not have prevailed "over the manner in which the trial judge conducted himself throughout the . . . trial." (*Sturm*, *supra*, 37 Cal.4th at p. 1244.) By repeatedly interrupting the proceedings to admonish counsel, asking questions of witnesses that often harmed the defense, and making comments that impugned the credibility of the defense case, the court telegraphed to the jury its disdain for the defense. (*Sturm*, *supra*, 37 Cal.4th at p. 1243 [the trial court's improper remarks were particularly prejudicial where the court "interjected itself unnecessarily and inappropriately into the adversary process" and "substantively undermined the defense theory of the case"]; *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207 [a repeated admonition could not cure the impression that the trial judge found the defense case to be weak]; *People v. Burns* (1952) 109 Cal.App.2d 524, 542 [same].) While perhaps no single instance of misconduct was prejudicial in and of itself, "when added together their influence increases as does the size of a snowball rolling downhill." (*Burns*, *supra*, at p. 543.)

Based on the totality of the judicial misconduct, we conclude the "errors were sufficiently severe and pervasive that it was reasonably probable that the errors affected the jury's deliberations,

_____

and you should not take me in there in any way. So during the trial you watched days and days you've seen me; you might think well, I know how the judge feels about this, probably feels about that; this witness; that witness; this question; that question; this lawyer; that lawyer. You might think you know those things. If you do, it's not something you ought to be considering. It's not the way the case is decided. So that's what I mean you don't take me in the jury room in any way."

to [Dorsett's] detriment" and therefore, the conviction must be reversed.  (*Sturm*, *supra*, 37 Cal.4th at p. 1230.)

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial.

NOT TO BE PUBLISHED


FEDERMAN, J.*


We concur:


CHANEY, J.


BENDIX, Acting P. J.


---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.